[No. C052747. Third Dist. July 3, 2008.]

THE PEOPLE, Plaintiff and Respondent, v.
GEORGE EDWARD JOHNSON, SR., Defendant and Appellant.

**[CERTIFIED FOR PARTIAL PUBLICATION†]**

---

†Pursuant to California Rules of Court, rule 8.1110, this opinion is certified for publication with the exception of parts I., II., and IV.

732

**Counsel**

Linda M. Leavitt, under appointment by the Court of Appeal, for Defendant and Appellant.

Edmund G. Brown, Jr., Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Julie A. Hokans and Michael Dolida, Deputy Attorneys General, for Plaintiff and Respondent.

**Opinion**

**CANTIL-SAKAUYE, J.**—A jury convicted 64-year-old defendant George Edward Johnson, Sr., of first degree murder (Pen. Code, § 187, subd. (a)—count one)[1] and stalking (§ 646.9, subd. (a)—count two) of his estranged wife Linza Johnson, and found true the allegation that defendant personally used a firearm in the commission of count one (§ 12022.5, former subd. (a)(1)). The court found true the allegation that defendant had a prior serious felony conviction within the meaning of section 667, subdivision (a), a "strike."

---

[1] Hereafter, undesignated statutory references are to the Penal Code.

(§§ 667, subds. (b)–(i), 1170.12.) The court sentenced defendant to an aggregate term of 50 years to life plus 19 years.

■ On appeal, defendant argues that he is entitled to reversal because (1) the court abused its discretion and violated his constitutional right to counsel by denying his request to substitute retained counsel; (2) the court abused its discretion under Evidence Code section 352 and violated his due process rights by admitting evidence of uncharged incidents of domestic violence; (3) the court violated his due process rights by instructing the jury with Judicial Council of California Criminal Jury Instructions (2006) CALCRIM No. 852; and (4) the prosecutor committed misconduct during closing argument. We shall affirm the judgment.

## FACTUAL AND PROCEDURAL BACKGROUND

The events giving rise to the charges against defendant occurred in 1996. In *People v. Johnson* (2000) 77 Cal.App.4th 410 [91 Cal.Rptr.2d 596] (*Johnson*), this court affirmed defendant's conviction following his first trial. That conviction was overturned for instructional error in a federal habeas corpus proceeding. The court rearraigned defendant on the current charges in October 2005.

In September 1996, defendant and Linza lived together with their sons, 22-year-old George, Jr., and 15-year-old Marquez. In late September 1996, George, Jr., arrived home to find his mother limping and in pain. He took her to the hospital for treatment and then called the police. After interviewing Linza, the police arrested defendant. George, Jr., told defendant not to return to the house.

Michael Stansfield, a female family friend, spent time at the Johnson residence after defendant moved out. Linza told Stansfield about her relationship with defendant. Stansfield observed key events that occurred in the fall of 1996.

Stansfield and George, Jr., testified that defendant came by the house a few times in October and November 1996. Defendant telephoned the house every other day. On some occasions, defendant simply drove by in his car. Other times he came to the door.

On one occasion, Linza and Stansfield were sitting in Linza's car in front of the house, waiting for Marquez to come out. Defendant drove up and stopped his car next to Linza's. He got out and bent over as if retrieving something. Thinking that defendant was reaching for a gun, Linza drove away. Defendant chased Linza in his car and she was unable to return to the house for more than 30 minutes.

On another occasion, Linza and Stansfield were returning from a high school basketball game in a car driven by Linza's friend Frank. When they stopped at a traffic light, defendant pulled up next to them. Frank made a left turn and defendant followed. Frank sped through surrounding streets in an effort to lose defendant. The chase lasted approximately 20 minutes.

Linza telephoned George, Jr., early on the morning of November 9, 1996. She sounded nervous and told him that defendant had nearly run her off Bowling Drive. Linza said that defendant knocked over several mailboxes during the chase. When Linza arrived home, George, Jr., inspected the car and saw new marks on the bumper. He and Linza called 911 and met California Highway Patrol Officer Lisa Beaudette at the scene of the incident. When Beaudette first arrived, she observed that several four-foot-tall mailboxes and a Federal Express box had been knocked off their concrete bases and scattered along the sidewalk and driveway on Bowling Drive. Beaudette also found a license plate from defendant's car in a search of the area.

Approximately two weeks before the murder, defendant went to the door of the house. He got into an argument with George, Jr., who would not let him inside. Defendant called Linza a whore and a bitch. He angrily yelled that he was going to get a gun and blow George, Jr.'s head off.

Another incident occurred on Monday, December 9, 1996, three days before the murder. Linza arrived home "jittery, nervous [and] frightened." She told George, Jr., and Stansfield that when she returned to her car after buying groceries, defendant was there. Linza said that he put a gun to her head and made her get into the car. Defendant drove Linza to the home of his sister Ethel who was not at home. Defendant told Linza that he wanted to have sex with her "mainly because she was still his wife and as long as she was his wife, he could have sex with her." Linza talked to defendant about reconciling so that he would let her go. Defendant telephoned Linza's sister, Antionette Farris, later the same day and told her that he had pulled a gun on Linza. He said that he wanted to talk to Linza, but she did not want to talk to him. Defendant told Farris that he hoped Linza would not force him to hurt one of their sons. He stated that if he had to hurt one of their sons, he would hurt or kill Linza as well. Defendant also told Farris about the incident in which he chased Linza with his car and crashed into some mailboxes.

Linza rented a U-Haul truck on Wednesday, December 11, 1996, so she could move out of the house. She, George, Jr., Marquez, Stansfield and Stansfield's son started loading the truck that night. They parked the truck away from Linza's house so that defendant would not know that she was moving. They continued loading the truck the following morning. Linza received two telephone calls from defendant between 5:30 and 6:00 a.m.

Stansfield heard Linza tell defendant that she was not moving anything out of the house and that he should not come over because of the restraining order.

Defendant arrived at the house between 8:00 and 9:00 a.m. in his sister's blue Honda Accord. He approached George, Jr., who was standing in the front yard. Defendant demanded the keys to the house, saying, "You're not leaving—you're not going anywhere." He grabbed the keys, unlocked the front door, and headed for the kitchen with George, Jr., right behind him. A scuffle ensued. Defendant pulled a small black revolver from his back pocket. George, Jr., knocked the gun from defendant's hand, but it landed within defendant's reach. Fearing that defendant would shoot him, George, Jr., ran from the house. He and Stansfield's son went to a neighbor's house to call 911.

When defendant reached the kitchen, he pulled the telephone wire from the wall and threw the phone on the floor. Linza came out of the master bedroom telling defendant to put the gun down so that they could talk. Defendant responded that he was going to kill her. He and Linza struggled in the hallway and inside the master bedroom. Stansfield heard the bedroom door slam, Linza saying, "George, George, stop, George stop," then three gunshots.

Stansfield tried to get out of the house through the garage, but the door was locked. When defendant left the house, Stansfield went back inside the house to call 911 from George, Jr.'s room. Defendant was on the porch and Linza was at the front door. Stansfield heard defendant say, "Bitch, you lied to me." Linza had her hand over the deadbolt, talking with defendant. She was trying to get defendant to calm down and leave, but defendant continued to demand that she unlock the door. Stansfield described defendant's voice as "mean and ugly."

While making the 911 call in George, Jr.'s room, Stansfield heard shooting. She hid in the closet. When Stansfield came out, she saw Linza lying on the floor near the front door.

There were two witnesses to what occurred on the front porch. George, Jr., who was across the street calling 911 from the neighbor's house, saw defendant standing close to the front door. He heard defendant scream, "Open up the door." At that point, George, Jr., heard two or three more gunshots. Defendant had a gun in his left hand when he turned and walked toward Linza's car.

Tsugio Tomono, the Johnsons' neighbor, saw defendant arrive at the house around 9:00 a.m. Shortly after defendant entered the house, Tomono saw two

young men run across the street and heard gunshots. He then heard glass breaking and "three pops." Both George, Jr., and Tomono watched defendant leave the scene.

Paramedics arrived at the Johnson house at 9:27 a.m. They were unable to revive Linza. The forensic pathologist testified that Linza died from a gunshot wound to the chest.

Defendant's cousin Marcellous Johnson, Jr., lived in Rancho Cordova with his daughter and her children. Defendant arrived at Marcellous's apartment between 10:00 and 11:00 a.m. the morning of the murder. His left arm was injured and wrapped in a shirt. Defendant told Marcellous that he had just shot and killed his wife. Defendant explained that he injured his arm when he put it through the front door window at his house. Marcellous offered to take defendant to the hospital but defendant did not want to go. Marcellous testified that defendant was sober when he arrived at the apartment, but drank until the police arrived to arrest him the following morning.

Defendant told Marcellous more details about the killing. Defendant said that he and Linza were supposed to go outside to talk, but once he stepped outside, Linza slammed and locked the front door. According to defendant, he knocked on the door and said, "Please let me in." Defendant told Marcellous that when Linza failed to let him in the house, he put his hand through the broken window and shot Linza three times. He fired more than one shot because he was not sure if he had hit Linza with the first one. Defendant threw the gun out of the car window on the way to Marcellous's apartment.

*Prior Incidents of Domestic Violence*

The prosecution introduced evidence of four uncharged incidents of domestic violence between defendant and Linza. The first incident occurred on December 4, 1986. George, Jr., saw defendant punch Linza twice on the side of the head. Sacramento County Sheriff's Deputy Rolfe Appel, who responded to the call, testified that Linza had a slight cut and minor swelling on the left side of her face near her eye.

The second incident occurred on December 31, 1988. On that date, George, Jr., saw defendant hit Linza in the stomach causing her to collapse and have a seizure. Defendant called 911. Sacramento County Sheriff's Detective Arnold Petty, Jr., spoke with defendant about the incident four days later. Defendant admitted hitting Linza "on the side down low, just like she said." Defendant also admitted that Linza had a seizure after she fell down.

The third incident occurred around October 29, 1990. Defendant admitted to Deputy Samuel Rivera that he slapped Linza with his hand because she did not want to talk with him.

The fourth incident occurred on August 23, 1992. George, Jr., testified that while in the car with his parents and brother, he saw defendant punch Linza in the face.

*Defendant's Testimony*

Defendant testified in his own defense. He denied chasing Linza and her friends after the basketball game. Defendant acknowledged running into some mailboxes on November 9, 1996, but denied chasing Linza that day. As to the December 9, 1996 incident, defendant testified that Linza came to his sister's house voluntarily. He stated that they talked and drank for three hours.

Defendant gave a different account of the events of December 12, 1996. He testified that he and Linza had agreed to a divorce. He planned to move back to the house after she and the boys moved out. According to defendant, Linza called him at 8:30 a.m. on December 12, 1996, and told him to come over and pick up a set of house keys.

In his testimony, defendant described a series of unfortunate accidents that occurred after he arrived at the house. Defendant was not thinking about the gun in his back pocket. He had carried it with him when visiting an unfamiliar neighborhood the night before. Defendant claimed it was the first time he had carried a gun, but admitted in later testimony that he had used a gun to shoot somebody in 1979. According to defendant, it was George, Jr., who pulled the gun from defendant's back pocket. Defendant testified that he accidentally pulled the phone cord out of the wall when moving a lamp. He shot the hole in the bedroom door in an attempt to get Linza to stop fighting him. Once locked outside, defendant wanted to get the keys to his sister's car so he could leave. He used the gun to break the glass in the door so he could reach the lock on the inside. In the process of breaking the glass, the gun went off. Defendant caught his arm on a piece of the broken glass. As defendant tried to free his arm, the gun accidentally fired a second time. Defendant testified that he did not intend to fire the gun and did not intend to shoot his wife.

## DISCUSSION

### I., II.*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

---

*See footnote, *ante,* page 731.

## III.

### *CALCRIM No. 852*

Defendant describes challenges and amendments to the 1996, 1999 and 2002 versions of CALJIC No. 2.50.02 regarding the use of Evidence Code section 1109 evidence and argues that CALCRIM No. 852 suffers from the same fundamental flaw as the CALJIC instructions used in the past. Defendant contends that "[b]y expressly permitting the jury to do the impermissible—infer guilt based on propensity—the instruction violates the defendant's due process rights. Moreover, CALCRIM 852 is both internally inconsistent and inconsistent with other instructions given to the jury in this case and, as a result, confuses and misleads the jury about the burden of proof and what must be proved in order to find the defendant guilty of the charged offense." There is no merit in defendant's argument. The court instructed the jury with CALCRIM No. 852, which states in relevant part:

"The People presented evidence that the defendant committed domestic violence that was not charged in this case, specifically, four acts alleged to have occurred in 1986—one in 1986, one in 1988, one in 1990, and one in 1992.

"Domestic violence means abuse committed, for our purposes, against an adult who is a spouse. Abuse means intentionally or recklessly causing or attempting to cause bodily injury or placing another person in reasonable fear of imminent serious bodily injury to himself or herself or to someone else.

"You may consider this evidence only if the People have proved by a preponderance of the evidence that the defendant in fact committed the uncharged domestic violence. [¶] Proof by a preponderance of the evidence is a different burden of proof from proof beyond a reasonable doubt. [¶] A fact is proved by a preponderance of the evidence if you conclude that it is more likely than not that the fact is true. [¶] If the People have not met this burden of proof, you must disregard this evidence entirely.

"If you decide that the defendant committed the uncharged domestic violence, you may, but are not required to, conclude from that evidence that the defendant was disposed or inclined to commit domestic violence and based on that decision also conclude that the defendant was likely to commit and did commit the offense charged in Count One of the Information or the lesser offenses of which I also instructed you on relating to Count One. [¶] If you conclude that the defendant committed the uncharged domestic violence, that conclusion is only one factor to consider along with all the other evidence. It is not sufficient by itself to prove that the defendant is guilty of

any of those offenses. The People must still prove each element of every charge beyond a reasonable doubt. [¶] . . . [¶]

"Do not consider this evidence for any other purpose, except for the limited purpose of the 1992 allegation. You may consider that as a prior inconsistent statement."

■ As we explained, Evidence Code sections 1108, allowing admission of evidence of uncharged sexual offenses, and 1109, allowing admission of evidence of uncharged domestic violence, are "virtually identical." (*Johnson, supra,* 77 Cal.App.4th at p. 417.) Likewise, the language of CALCRIM No. 1191, the current instruction on Evidence Code section 1108, tracks the language of CALCRIM No. 852, the current instruction on Evidence Code section 1109.[5] This court recently rejected a constitutional challenge to CALCRIM No. 1191 in *Schnabel,*[6] stating: "As to defendant's challenge to the instruction, it is based on his assertion that the instruction on the use of prior sex offenses 'wholly swallowed the "beyond reasonable doubt" require-ment.' The California Supreme Court has rejected this argument in upholding the constitutionality of the 1999 version of CALJIC No. 2.50.01. (*People v. Reliford* (2003) 29 Cal.4th 1007, 1012–1016 [130 Cal.Rptr.2d 254, 62 P.3d 601].) The version of CALJIC No. 2.50.01 considered in *Reliford* is similar in all material respects to Judicial Council of California Criminal Jury Instruc-tions (2006) CALCRIM No. 1191 (which was given here) in its explanation of the law on permissive inferences and the burden of proof. We are in no position to reconsider the Supreme Court's holding in *Reliford (Auto Equity Sales, Inc. v. Superior Court* [(1962)] 57 Cal.2d [450,] 455 [20 Cal.Rptr. 321, 369 P.2d 937]), and by analogy to *Reliford,* we reject defendant's argument

---

[5] The version of CALCRIM No. 1191 given in *People v. Schnabel* (2007) 150 Cal.App.4th 83 [57 Cal.Rptr.3d 922] (*Schnabel*) read in relevant part: " 'You may consider [the uncharged sex offenses] evidence only if the People have proved by a preponderance of the evidence that the defendant in fact committed the uncharged offenses. Proof by a preponderance of the evidence is a different burden of proof from proof beyond a reasonable doubt. A fact is proved by a preponderance of the evidence if you conclude that it is more likely than not that the fact is true. [¶] If the People have not met this burden of proof, you must disregard this evidence entirely, that is, the uncharged crimes evidence. [¶] If you decide that the defendant committed the uncharged offense or offenses, you may, but are not required to, conclude from that evidence that the defendant was disposed or inclined to commit sexual offenses, and based on that decision, also conclude that the defendant was likely to commit the sex offenses as charged here. [¶] If you conclude that the defendant committed the uncharged offense or offenses, that conclusion is only one factor to consider along with all the other evidence. It is not sufficient by itself to prove that the defendant is guilty of the charged sexual offenses. The People must still prove each element of every charge beyond a reasonable doubt.' " (*Id.* at p. 87, fn. 3.)

[6] The Supreme Court ordered *Schnabel* depublished on July 25, 2007, by a grant of review on an unrelated issue. (*People v. Schnabel* (July 25, 2007, S152830) 2007 Cal. Lexis 7885.) The Reporter of Decisions subsequently was directed to publish the opinion. (*People v. Schnabel* (Oct. 24, 2007, S152830) 2007 Cal. Lexis 12134.)

regarding the jury instruction on use of his prior sex offenses." (*Schnabel, supra,* 150 Cal.App.4th at p. 87, fn. omitted.) The same rationale applies to the case before us.

## IV.

### *Prosecutorial Misconduct**

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

## DISPOSITION

The judgment is affirmed.

Davis, Acting P. J., and Morrison, J., concurred.

Appellant's petition for review by the Supreme Court was denied October 1, 2008, S165876. Kennard, J., did not participate therein.

---

*See footnote, *ante,* page 731.