Filed 12/17/13  P. v. Sheldon CA1/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>OSKAR W. SHELDON,<br><br>        Defendant and Appellant. | A133373<br><br>(San Francisco County<br>  Super. Ct. No. 206710) |

Defendant Oskar W. Sheldon appeals from a judgment convicting him of domestic violence, assault with force likely to produce great bodily injury and false imprisonment. He contends the court made numerous errors with regard to the admission of evidence, failed to cure prejudicial prosecutorial misconduct during closing argument and unconstitutionally reduced the burden of proof by instructing the jury with CALCRIM No. 852. We reject defendant's claims of evidentiary and instructional error and find that any failure by the court to cure the alleged misconduct during closing argument was harmless. Accordingly, we shall affirm the judgment.

### Factual and Procedural Background

Defendant was charged by indictment with torture (Pen. Code, § 206)(Count I), domestic violence (Pen. Code, § 273.5, subd. (a))(Count II), assault with force likely to cause great bodily injury (Pen. Code, § 245, subd. (a)(1))(Count III), and false imprisonment (Pen. Code, § 236)(Count IV). Allegations of personal infliction of great bodily injury in the context of domestic violence (Pen. Code, § 12022.7, subd. (e)) were attached to Counts II-IV.

A jury trial began on September 9, 2010. On September 13, during jury selection but out of the presence of the jury, defendant entered guilty pleas to Counts II and III, leaving Counts I and IV and the enhancements for trial.

The following evidence was presented at trial:

In September 2006, defendant met and began a romantic relationship with the victim. He began renting a room in her home in the same month. In March 2007, however, the victim asked defendant to move out because she received a notice from the landlord warning her that she was going to be evicted because defendant's behavior was disturbing the neighbors.

On April 3, 2007, the victim confronted defendant on the telephone about his failure to move out. After the conversation, the victim went to her parents' home to spend the night because defendant sounded angry on the phone and she was afraid of him. She testified that for a few months he had been accusing her of stealing marijuana from him, and in March she had been involved in an incident during which he again accused her of stealing from him and threw her on the bed, put his hands around her neck, and started to choke and smother her. A friend who was there pulled him away. She ran out of the house but had not reported the incident to the police because she expected him to move out in a few days.

Later in the evening on April 3, the victim returned to her home after defendant left her a phone message stating that he would remove his items and she did not have to stay away from her home. Defendant was not at the house when she arrived, but he had not removed his belongings.

The victim was awakened by loud pounding on her door around 4:00 a.m. on April 4. She let defendant and his friend into her home and returned to bed. When defendant and his friend began making noise outside her bedroom, she feared that the neighbors would call the police, so she got out of bed and told him to be quiet. When defendant told her to "shut up," she said she could not sleep and would have to leave. He responded, "You can't go anywhere. My truck is blocking your truck. So you can't leave."

2

Defendant became increasingly angry and began accusing the victim of stealing from him again. He began ransacking her home, ripping down paintings and window shades and throwing everything from the kitchen counter on to the floor. The victim was shocked and scared by defendant's behavior. She asked him to stop but he kept yelling, "Fuck you bitch. Give me my money." She looked to defendant's friend for help, but he said "I'm going outside" and left.

Defendant kicked the victim in the shins until she fell to the ground. He continued to kick her after she was on the ground. He dragged her by her legs into the office and closed the door. He grabbed the victim by her hair and pounded her head into the ground repeatedly. She pleaded with him to stop, but he put his hands on her throat. Defendant was on top of her and she could not move. The victim testified that defendant beat her continuously for an hour. At one point, he picked up her sewing machine and hit her head with it repeatedly. He was squeezing her throat, and it was hard for her to breathe. She started to lose consciousness and thought she was dying.

The victim's neighbors were awakened by the screaming. They heard banging sounds and heard a female voice say, "Help me" and "get off me" and heard an angry, male voice saying, "Shut up. Where's the money, bitch?" and "Where's the money, fucking bitch." The neighbors called 911. The police arrived at the location less than 30 minutes later.

San Francisco Police Officer Alan Lamb responded at 4:48 a.m. When he arrived, he heard a male voice scream, "Give me my money." He also heard three loud slapping sounds. When Officer Lamb yelled at the second story window to let him inside the residence, a man told him to leave.

When Officer Patrice Scanlan arrived a few minutes later, the other officers were yelling at a second story window. Officer Scanlan saw the man in the window tell the officers to leave. The man carried a woman to the window, his arms hooked under her armpits and her face turned into his body so the officer could not see it. Her body was limp, and Scanlan did not know if she was unconscious or had been drinking. The man said, "Look. She's fine. Go away." He then dropped the female on the couch. Her head

3

hit the back of the couch when she fell. The female waved at the officers and said, "I'm fine. Go away." When Scanlan looked up at the window again, she saw the woman sitting up, unsupported, as she smoothed her hair. The officers continued to yell for the man to open the door and eventually, the victim opened the door for the officers. Officer Scanlon called for an ambulance because she saw that the victim was severely injured. Scanlan observed that the woman had cuts on her right foot, severe bruising and scratches on her face and neck, her lip was "busted" and she had blood on her nose. Both eyes were bloodshot.

Officers searched the residence but did not locate the man in the house. The neighbor testified that after the police arrived, he saw a man exit a nearby house, climb over a neighbor's fence, and walk toward the beach.

The emergency room physician who treated the victim on April 4 testified regarding the victim's multiple injuries. She had a hematoma around her left eye and bruising above the right eye. She had bruising on her neck, abrasions on her right elbow, a hematoma on her right hip, and bruising on her legs. Her left eye was severely swollen. She had a nondisplaced nasal fracture and a hematoma on the right side of the scalp. She was in a great deal of pain.~ (12 RT 2510)~ The doctor opined that the victim had suffered "significant trauma" and that her injuries were caused probably by a blow with a blunt object with "a significant amount of force."

An inspector with the San Francisco Police Department interviewed the victim at the hospital on April 4. He took pictures of the injuries to her face, arms, and legs. When he spoke with the victim again the following day she spoke slowly during the questioning and identified defendant as her attacker.

Private investigator Don Criswell has known the victim for years. On April 10, he went to the victim's home to observe and document the conditions. The living room was in disarray; the window blinds were lying across the sofa. The kitchen was a mess. Items were scattered on the floor of the office. Criswell located the sewing machine against the wall in the office. He saw what he believed was blood splattered on the wall near the sewing machine and also saw blood on the edge of the sewing machine. Criswell brought

4

the sewing machine to the police approximately five weeks after the assault. The sewing machine was not inspected for forensic evidence.

The victim's primary care physician, Dr. Marilyn Kutscher, examined the victim on April 6. The victim had multiple scratches and bruises on her face and body. She had swollen eyeballs and decreased vision in her left eye. She had bleeding behind her ears suggesting she had suffered a traumatic head injury. Ten days later, the victim still had swelling behind her eyes, and her neck was still very sore. The victim testified that as a result of the attack she could not see for a few days and could not walk for six weeks. For a year after the incident she could not run in the manner to which she was accustomed.

Peter Lofgren testified that he went to the victim's residence with defendant on the evening of April 3. When he left, defendant and the victim were not arguing. The next day, defendant called Lofgren to pick him up. Defendant told Lofgren that he and the victim had argued and that he had to move out of her residence.

The defense offered doctor Michael Laufer as an expert in injury reconstruction. Focusing on the injuries to the victim's head and face, he identified numerous contusions and abrasions as well as a section of her scalp, approximately three-and-a-half to four inches long and an inch-and-a-half wide, where her hair was missing. He opined that some of the contusions were likely caused by impact with a hard, flat surface, while others were consistent with a non-flat object. He did not believe the sewing machine was likely to have caused the contusions due to the absence of any lacerations or fractures. He acknowledged that a sewing machine dropped on the victim's head from only two feet above would not be "sufficient to actually fracture the skull" but that he "would expect at least a laceration of the forehead."

The jury found defendant guilty of false imprisonment and found the great bodily injury allegations true. The court dismissed the torture count after the jury remained deadlocked on that charge. Defendant was sentenced to a prison term of two years on the domestic violence count, with a consecutive term of three years for infliction of great

bodily injury, for a total sentence of five years. The court stayed the sentences for Counts III and IV pursuant to Penal Code section 654.

Defendant's motion to file a late notice of appeal was granted on October 28, 2011.

**Discussion**

1. ***The court did not err in allowing Officer Scanlon to testify regarding the severity of the victim's injuries.***

Defendant contends the court erred in admitting testimony by Officer Scanlon regarding the severity of the victim's injuries, particularly the comparison to injuries she had observed in other domestic violence or assault cases.  Officer Scanlan testified that she called for an ambulance when she saw the victim's injuries "[b]ecause the injuries looked severe to [her]."  When asked whether she had a "good memory" of this case she said "yes" and explained that this incident "stands out because the visible injuries were really severe and [she did not] normally see someone that injured." She explained further that her opinion regarding the severity of the injuries was based "on the other calls [she had] been on. Reports [she had] taken for domestic violence assaults. Mutual combat fights. Usually a victim doesn't have as severe obvious bruising and swelling and cuts . . . straightaway." Defendant's objection to Scanlon's testimony under Evidence Code[1] section 352 was overruled.

On appeal, defendant argues that the court abused its discretion in refusing to exclude Officer Scanlon's testimony under section 352. He argues that her testimony had little probative value as a lay opinion because her "testimony could not help the jurors to determine whether [defendant] . . . had inflicted great bodily injury" and was highly confusing and prejudicial. He argues that "her testimony as an experienced police officer carried a misleading aura of authority" and "tempted the jurors to conclude that [the victim's] 'severe' and 'obvious' injuries, which seemed unique to a police officer

---

[1] All statutory references are to the Evidence Code unless otherwise noted.

6

familiar with assault cases, must surely constitute the 'great bodily injury' that [defendant] was charged with having inflicted." We disagree.

Lay opinion testimony is admissible if it is based on the witness's own perceptions and personal observations and is helpful to understanding the witness's testimony. (§ 800.) Scanlon's testimony that the injuries were severe and obvious was based on her own observation and perception of the victim's injuries. Her testimony that she believed the injuries were severe based on her experience as a police officer clarified and gave context to her testimony. As noted by the trial court, this testimony was also relevant to explain both why she immediately called for an ambulance and why she could remember the victim's injuries three years after the attack.

Contrary to defendant's argument, the probative value of the testimony was not outweighed by potential undue prejudice. That the opinion was offered by a police officer does not make its admission unduly prejudicial. Moreover, any potential prejudice was addressed by the instruction pursuant to CALCRIM No. 226 that the jury "must judge the testimony of each witness by the same standards, setting aside any bias or prejudice [they] may have." The fact that the jurors deliberated for three days, repeatedly asking for clarification of relevant instructions and asking for read-back of key witness testimony supports the conclusion that the jury did not merely substitute Scanlon's opinion regarding the severity of the injuries for its own determination that the victim suffered great bodily injury.

**2.** ***The prosecutor's reference in closing argument to stricken testimony was harmless.***

Defendant contends the prosecutor committed misconduct by referring to a statement made by Dr. Kutscher regarding the severity of the victim's injuries that had been stricken and the court failed to cure the misconduct by failing to give an adequate admonition or cautionary instruction.

The statement in question was volunteered by Dr. Kutscher on cross-examination after stating that the victim had not reported to her that she was hit with a sewing machine: "I would add though that in my 30 years' experience [the victim] was one of the

7

most beaten up people I'd ever seen . . . ." Following a defense objection, this testimony was stricken as nonresponsive. In closing argument, however, the prosecutor referred to the doctor's statement to emphasize the severity of the injuries. The prosecutor argued, "[A]s Dr. Kutscher said, this was one of the worst beaten women she's seen in 30 years of practice." Defense counsel objected, pointing out that the statement had been stricken, but the prosecutor responded that it had not. The court did not rule on the objection but noted that the jury could request a readback. Later, the jury in fact requested the readback which confirmed that the statement had been stricken.

The court instructed the jury pursuant to CALCRIM No. 222 that it must disregard evidence that was stricken.[2] The trial court also instructed the jury that "[n]othing that the attorneys say is evidence." While the court's failure to rule on the objection was problematic, any error was harmless. (*People v. Watson* (1956) 46 Cal.2d 818, 836.) Under the circumstances, we must presume that the jury followed the court's instructions and disregarded the stricken testimony.

**3.**    ***The court did not err in admitting Donald Criswell's testimony that he saw blood spots on the wall of the victim's home.***

Defendant contends the court erred in admitting Criswell's testimony about blood spots he observed at the victim's house. The Attorney General argues that the court properly admitted the testimony as that of a percipient witness. We agree.

Criswell testified, over objection, that while in the victim's office, he "saw what appeared to [him] to be flecks of blood on the wall." He explained, "I've seen a great deal of this in my career and I thought I knew what I was looking at. It appeared to be the blood spray[ed] or splattered against the wall." He also saw "traces of what I thought was blood along the . . . back edge of the sewing machine." The trial court overruled

---

[2] CALCRIM No. 222, as given, provides, "During the trial, the attorneys may have objected to questions or moved to strike answers given by the witnesses. I ruled on the objections according to the law. If I sustained an objection, you must ignore the question. If the witness was not permitted to answer, do not guess what the answer might have been or why I ruled as I did. If I ordered testimony stricken from the record you must disregard it and must not consider that testimony for any purpose."

defendant's objection that there was no foundation for Criswell's testimony. The court explained that Criswell was not testifying as an expert in blood splatter, but rather as a lay witness testifying as to what he thought he had seen.

While expert testimony is frequently used to explain or interpret blood splatter evidence, expert qualification is not necessary when the witness, as in this case, merely identifies the substance observed as what appeared to be blood and describes where the spots were found and what they looked like. "[T]he decisive consideration in determining the [necessity] of expert opinion evidence is whether the subject of inquiry is one of such common knowledge that [persons] of ordinary education could reach a conclusion as intelligently as the witness or whether, on the other hand, the matter is sufficiently beyond common experience that the opinion of an expert" is required. (*People v. Cole* (1956) 47 Cal.2d 99, 103.) "Unfortunately, many violent crimes may require witnesses to testify that substances they saw in connection with the crime was blood. Technically, such substances probably cannot be definitively identified as blood without scientific testing, but courts nevertheless permit lay witnesses to give their opinion that what they observed appeared to be or was blood. This approach is based on the commonsensical conclusion that the ordinary person is exposed to blood in the course of their life experiences and thus is quite capable of giving an opinion that a particular substance was blood." (3 Wharton's Criminal Evidence § 12:12 (15th ed.) footnotes omitted.) The fact that Criswell's opinion was based on his experience as a police investigator does not undermine, and in fact may strengthen, that conclusion, nor does it render his testimony unduly prejudicial under section 352. The trial court did not abuse its discretion in admitting Criswell's testimony.

**4.**     ***The trial court properly limited evidence of the victim's prior "psychotic episode."***

Prior to trial, the defense moved to admit evidence of the victim's previous "psychotic or hallucinatory" behavior on the ground that it was relevant to the victim's credibility. The documentary evidence provided for the court's review set forth the relevant facts: On December 2, 2006, San Francisco police officers found the victim

9

running in the middle of the street trying to hit cars with her hands. She was screaming, "kill me, kill me." When one officer approached her, she began to scream obscenities and nonsensical threats. The officers detained the victim as a danger to herself (Welf. & Inst. Code § 5150) and brought her to the hospital for a 72-hour detention and mental health evaluation. The psychiatric reports indicate that the victim was intoxicated when she arrived at the hospital and that she "has a strong family history of schizophrenia and per patient she [discontinued] her psychiatric medication and stopped seeing her psychiatrist 3 weeks ago." According to the reports, the victim believed that the police and doctors intended to harm her and that she was very powerful and would destroy those who wanted to hurt her.The court ruled that the defense could cross-examine the victim about the prior incident, but could not present witnesses to opine on her mental state.

Consistent with the court's ruling, defense counsel cross-examined the victim regarding the December 2006 incident. The victim acknowledged having contact with police in December 2006 but claimed that she could not remember any of the details of the incident. She testified that she believes she was given a "spiked" drink at a concert that caused her to hallucinate. She did not recall telling doctors that she stopped taking her "mental health medications" and denied that she was taking any such medications. She explained that her mental health has always been very good and that the only prescription medication she takes is for a learning disability.

After the victim's testimony, defense counsel renewed his request that a psychiatrist be allowed to testify regarding the December 2006 incident. The court denied the motion, citing relevance and section 352. The court explained that based on the court's review of the psychiatric records there is "no evidence that would tie that incident to this incident" and that presentation of live testimony on the prior incident would be irrelevant and time consuming.

Defendant contends that the court abused its discretion in excluding this testimony. He argues that "[e]xclusion of this evidence permitted [the victim] to testify as if she were competent and credible and thereby deprived [defendant] of his state and federal constitutional right to due process."

10

"[M]ental illness or emotional instability of a witness can be relevant on the issue of credibility, and a witness may be cross-examined on that subject, if such illness affects the witness's ability to perceive . . . ." (*People v. Gurule* (2002) 28 Cal.4th 557, 591–592.) As set forth above, the defense cross-examined the witness extensively regarding the December incident. She acknowledged hallucinating on the night in question but denied any history of mental illness. As noted by the trial court, the record does not contain any evidence or suggestion that the witness suffers from an ongoing mental illness or has a history of hallucinations apart from the December incident. The trial court reasonably concluded that further testimony regarding the incident by one of the treating psychiatrists would be cumulative and unnecessarily time consuming. Accordingly, the court did not abuse its discretion in excluding the additional requested testimony.

**5.** ***The court did not err by instructing the jury with CALCRIM No. 852.***

Evidence of prior criminal acts is ordinarily inadmissible to show a defendant's disposition to commit such acts. (§ 1101.) However, the Legislature has created exceptions to this rule in cases involving sexual offenses (§ 1108) and domestic violence (§ 1109). The jury was instructed on the application of section 1109 as follows: "The People presented evidence defendant committed domestic violence that was not charged in this case, specifically assaulting [the victim] on [sic] March 2007. . . .[¶] . . .You may consider this evidence only if the People have proved by a preponderance of the evidence the defendant in fact committed the uncharged domestic violence. [¶] Proof by a preponderance of the evidence is a different burden of proof from proof beyond a reasonable doubt. A fact is proved by a preponderance of the evidence if you conclude that it is more likely than not that the fact is true. If the People have not met this burden of proof, you must disregard this evidence entirely. If you decide the defendant committed the uncharged domestic violence, you may but are not required to conclude from any evidence the defendant was disposed and inclined to commit domestic violence and based on that decision, also conclude defendant was likely to commit and did commit torture and physical imprisonment as charged here. [¶] If you conclude defendant committed the uncharged domestic violence, that conclusion is only one factor to

11

consider along with all the other evidence. It is not sufficient by itself to prove the defendant is guilty of either charge. The People must still prove each charge and allegation beyond a reasonable doubt. Do not consider this evidence for any other purpose except for the limited purpose stated in this instruction . . . ."Defendant contends that CALCRIM No. 852 as given in this case violated his due process rights because it unconstitutionally altered the burden of proof. The Attorney General correctly notes that the arguments advanced by defendant have been rejected on several occasions. (*People v. Reliford* (2003) 29 Cal.4th 1007, 1016 (*Reliford*) [rejecting due process challenge to CALJIC No. 2.50.01 which explains the application of Evidence Code section 1108].; *People v. Reyes* (2008) 160 Cal.App.4th 246, 250–253 (*Reyes*) [finding that there is no material difference between the instruction found constitutional in *Reliford* and CALCRIM No. 852]; *People v. Johnson* (2008) 164 Cal.App.4th 731, 738–740 (*Johnson*) [same].)

Defendant argues that *Reliford* is not controlling because the instruction in that case provided "If you find that the defendant committed a prior sexual offense . . ., you may, but are not required to, *infer* that the defendant had a disposition to commit the same or similar type sexual offenses," (*People v. Reliford, supra,* 29 Cal.4th at p. 1012, italics added) whereas CALCRIM No. 852 provides, "If you decide the defendant committed the uncharged domestic violence, you may but are not required to *conclude* from any evidence that the defendant was disposed to or inclined to commit domestic violence and . . . torture and physical imprisonment as charged here." (Italics added.) He argues that there is a significant difference between the words "infer" and "conclude": "To 'infer' designates an analytic step that is one part of a longer process. To 'conclude' refers to the final step in that process. Once the jury has arrived at a conclusion, no further reasoning is required: the process is complete. The use of 'conclude' thus makes the following sentences, which advise the jury that it still needs to find each offense proved beyond a reasonable doubt, directly contradictory. If the jury's analytic process has reached a 'conclusion,' no further analysis is required. Because that 'conclusion' could have been reached by a preponderance of the evidence rather than proof beyond a

12

reasonable doubt, the instruction as given does not pass constitutional muster." He suggests that *People v. Johnson* and *People v. Reyes* are not persuasive insofar as they fail to "perceive or address the difference between 'infer' and 'conclude.' "

We do not find the distinction persuasive. "Conclude" and "infer" are virtually synonomous. One definition of "infer" is "to form (an opinion) from evidence : to reach (a conclusion) based on known facts." A definition of "conclude" is "to reach as a logically necessary end by reasoning : infer on the basis of evidence." (http://www.merriam-webster.com.) Given the common definition of these words, there is no material difference between the instruction upheld in *Reliford* and CALCRIM No. 852. Moreover, in light of the clear direction in the final paragraph of the instruction that the jury's "conclusion" that defendant committed the uncharged domestic violence "is not sufficient by itself to prove the defendant is guilty of either charge" and that "[t]he People must still prove each charge and allegation beyond a reasonable doubt," a jury would not likely be misled by this instruction. (*People v. Ramos* (2008) 163 Cal.App.4th 1082, 1088 [" ' "In determining whether error has been committed in giving or not giving jury instructions, we must consider the instructions as a whole . . . [and] assume that the jurors are intelligent persons and capable of understanding and correlating all jury instructions which are given" ' "].)

### 6. *Defense counsel did not render ineffective assistance by failing to object to the verdict form.*

The verdict form for the great bodily injury enhancement allegation provided as follows: "The Defendant has previously pleaded guilty to the crime of Assault With Force Likely to cause Great Bodily Injury, in violation of Section 245(a)(1) of the California Penal Code. [¶] We the Jury in the above-entitled cause, find the allegation that the Defendant, Oskar Sheldon, personally inflicted great bodily injury during the commission of the offense, within the meaning of Section 12022.7(e) of the California Penal Code." Although defense counsel initially indicated an intent to object to the verdict form, when given an opportunity to place his objection on the record, he only made a record of his objections to the instructions and failed to mention the verdict form.

13

Defendant contends his attorney's failure to object constituted ineffective assistance because the verdict form misled the jury and shifted the burden of proof. He argues, "the verdict form had the effect of a constitutionally defective instruction. It did not simply ask the jurors whether or not [defendant] had inflicted great bodily injury. Instead, it first advised them that he had already entered a guilty plea to the charge of assault with force that was *likely* to cause such injury. This preface was irrelevant and overly suggestive. It allowed the jurors to reason that only if something *unlikely* had occurred — only if force that was likely to cause great bodily injury did not actually cause it — could they choose 'not true' on the verdict form. In this way, the verdict form shifted the burden of proof from the prosecution to the defense."

The standard for establishing ineffective assistance of counsel is well settled. The " 'defendant bears the burden of showing, first, that counsel's performance was deficient, falling below an objective standard of reasonableness under prevailing professional norms. Second, a defendant must establish that, absent counsel's error, it is reasonably probable that the verdict would have been more favorable to him.' " (*People v. Hernandez* (2004) 33 Cal.4th 1040, 1052-1053; see also *Strickland v. Washington* (1984) 466 U.S. 668, 687, 694.)

Without considering whether the failure to object was a tactical decision or even a deficiency, we reject defendant's claim based on the absence of any prejudice. (*Strickland v. Washington*, *supra*, 466 U.S. at p. 697 ["If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed"].)

In this case, it is not reasonably probable that the verdict would have been more favorable had the verdict form been phrased differently. The jury was clearly instructed that on counts 2, 3, and 4, it must "decide whether the people have proved the *additional* allegation the defendant personally inflicted great bodily injury on [the victim] during the commission of that crime." (Italics added.) "Great bodily injury" was defined for the jury as "significant and substantial physical injury. It is an injury that is greater than minor or moderate." During his closing argument, defense counsel advised the jury that defendant

14

had taken responsibility for certain conduct that occurred on April 4, including domestic violence and an assault by means of force likely to produce great bodily injury, but he attempted to draw a distinction between the victim's "swelling and bruising" and "someone who has suffered extensive, extreme great bodily injury as a result of domestic violence." He argued, "The charge that [defendant] pled to in terms of the assault, great bodily injury with force likely to produce great bodily injury. Not force that produced great bodily injury, not force that's demonstrated to have produced great bodily injury but force likely. You sitting as the jury . . . are the ones that determine whether or not the bruising and swelling, discoloration and discomfort and taking of some pain pills is equal to great bodily injury." Thus, counsel dispelled any potential confusion or misunderstanding by the jury regarding the effect of defendant's guilty plea on the enhancement allegation. Finally, the jury's extensive deliberations on this issue strongly suggests that the jury did not merely rely on the guilty plea to presume the injury actually inflicted met the definition of great bodily injury.

## 7.     *There was no cumulative error.*

Having found no prejudicial error, we reject defendant's argument that the cumulative effect of the alleged errors he identifies require reversal of the judgment. (*People v. Wallace* (2008) 44 Cal.4th 1032, 1099.)

**Disposition**

The judgment is affirmed.

_____
Pollak, J.

We concur:

_____
McGuiness, P. J.

_____
Siggins, J.