Filed 1/22/25  P. v. Ramos CA2/7

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION SEVEN

| | |
|---|---|
| THE PEOPLE, | B335043 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. BA496684) |
| v. | |
| EVELIO RAMOS, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Michael Garcia, Judge.  Affirmed.

The Justice Firm and Joseph Anthony Virgilio for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Senior Assistant Attorney General, Kenneth C. Byrne and Sophia A. Lecky, Deputy Attorneys General, for Plaintiff and Respondent.

_____

Evelio Ramos was charged with and convicted of numerous acts of sexual abuse against his young stepdaughters over a period of about six years. At trial, the prosecution introduced evidence that he also committed non-sexual physical abuse against his stepchildren. Because Ramos was not charged with those acts of physical abuse, he contends the trial court abused its discretion under Evidence Code section 352[1] by allowing the jury to hear about them. We conclude otherwise. The trial court reasonably determined the probative value of the evidence was not substantially outweighed by the risk of undue prejudice. Among other things, the evidence of non-sexual physical abuse showed Ramos's disposition for domestic violence and provided proof of duress, which was relevant to the charged sexual offenses. The probative value of the uncharged non-sexual physical abuse evidence also was not substantially outweighed by the risk it would evoke unfair emotional bias in the jury. It was far less inflammatory than the evidence of the charged sexual abuse, which included graphic testimony of forcible sex crimes against a child. For these reasons, we affirm.

### FACTUAL AND PROCEDURAL BACKGROUND

A.    *Ramos Sexually Abuses Denise for Several Years*

Denise is the youngest of six siblings, three of whom—Doris, Elizabeth, and Jimmy—lived together with her, their mother, and Ramos. Denise was around seven years old when Ramos married her mother and the family moved to a house together. The sexual abuse began shortly thereafter.

---

[1]    All further undesignated statutory references are to the Evidence Code.

Ramos began by groping Denise. In one early incident, Denise recalls being in the backyard and Ramos asking her if she wanted him to touch her, which she understood to mean in a sexual way. Gradually, Ramos began grabbing Denise's breasts and buttocks over her clothes while making inappropriate comments. Eventually Ramos would put his hands underneath her pants or inside her shirt.

Soon thereafter, Ramos started regularly digitally penetrating Denise's vagina. Ramos would ask her to help him carry his tools to the shed in the backyard. There Ramos would put his hands inside her pants and insert his fingers into her vagina. It hurt because Ramos had big hands and long fingernails. Denise told Ramos it was painful, but he ignored her. He would keep his fingers inserted in her vagina for about a minute. When he removed his fingers, he would smell them. He would then act like nothing had happened. Ramos did this more than 15 times in the shed.

Ramos would also molest Denise in the shower. While Denise was showering, he would unlock the bathroom door and pull back the sliding glass shower door. Ramos would then fondle Denise's breasts and digitally penetrate her vagina, leaving his fingers inside her for a few minutes. Ramos did this between five and 10 times in the shower and bathroom.

Starting when Denise was about eight or nine years old, Ramos would force Denise to touch and stroke his penis, and to put it in her mouth. On some occasions, Ramos would ask Denise to come to the basement to help him with a chore and would touch her breasts, put his hands inside her pants, and insert his fingers into her vagina. Ramos would then remove his erect penis from his pants and make her put it in her mouth. He

would grab Denise's head or hair to force her to keep his penis in her mouth. This would make her gag and choke, which disgusted her. Ramos did this about 10 to 15 times in the basement.

On other occasions, Ramos would take Denise on errands in his pickup truck. While in the truck, Ramos would sometimes remove his penis, grab Denise's wrist, and make her stroke his penis. Other times Ramos would touch her breasts or vagina. Ramos would also masturbate in Denise's presence. These incidents also occurred in the hallways and living room of the house.

When Denise was still about eight or nine years old, Ramos began penetrating her vagina with his penis. Ramos did this at least 40 times—about half of which occurred before Denise turned 11 and about half of which occurred after Denise turned 11. Denise recounted how Ramos would take her to his bedroom, lock the door, and toss her on the bed. He would then take off her pants and hold her down by her wrists. Ramos would force his penis inside her vagina—starting with just the tip, but eventually forcing it entirely inside her. This was painful. When Denise would not comply, Ramos would raise his voice and make an angry face. Denise felt scared, uncomfortable, and threatened. Sometimes it would cause tearing and bleeding, and Denise would go to the bathroom afterwards to clean up the blood and cry. In addition to the bedroom, Ramos would also rape Denise in the shed and basement.

During these years, siblings observed that Denise was severely depressed, engaged in self-harm, and barely ate. She would often have dark circles under her eyes from not sleeping. Denise was always sad and would beg her siblings not to leave her alone with Ramos. She also rarely wanted to sleep in her

own room, preferring instead to sleep with her older sister Doris. Eventually Ramos forbade Denise from sleeping in Doris's room.

B.     *Ramos Sexually Touches Elizabeth*

Ramos also sexually abused Denise's older sister Elizabeth once when she was 13 years old. Elizabeth was lying in bed pretending to be asleep. Ramos entered her room, closed the door, lay on top of her, and rubbed her vagina over her clothes in a circular motion with his elbow. Elizabeth felt disgusted but did not react out of fear Ramos would make her do chores. Elizabeth did not realize this conduct was not normal until she was 15 years old.

C.     *Denise and Elizabeth Report the Sexual Abuse*

Ramos continued to sexually abuse Denise until she reported it at age 13. She first told her older brother, Jimmy, during a late-night conversation. Jimmy was upset and cried. Days later, angry about the sexual abuse his sister had suffered, Jimmy stabbed Ramos with a kitchen knife and ran off. Ramos was taken to the hospital. Doris, the eldest sibling living in the house, came home that night and found out about the sexual abuse. Doris got upset and called their mother, who was at Ramos's bedside at the hospital. Doris demanded that her mother come home so they could go to the police station to report the abuse. Their mother was reluctant at first but eventually complied.

At the police station, Denise cried and was unable to speak. She wrote down her answers to police interview questions instead. Police also interviewed Elizabeth. Before the interview, the children's mother tried to persuade Denise and Elizabeth that someone other than Ramos must have sexually assaulted Denise.

Denise confirmed it was Ramos. Their mother's insistence confused Elizabeth, who later realized her mother was trying to manipulate her to disbelieve Denise's allegations. During the police interview, Elizabeth recounted physical abuse by Ramos but did not mention the incident in which Ramos touched her sexually. The incident was "in the back of [her] head," she "didn't really know how to bring it up," and she "didn't know if that was the correct moment for [her] to say anything." Elizabeth was also worried about being taken away from her mother.

After the police interviews, a medical forensic exam was conducted on Denise at a rape center. There were no physical findings from the exam. This was not unusual because over 50 percent of sexual assault victims have no visible physical injuries. For prepubescent children, that number is 80 percent. Injuries to the vagina that occur when a child is age nine or 10 would not show up when an exam is conducted years later at age 13.

Shortly after the police got involved, the children's mother took Elizabeth out of school to meet with an attorney. Their mother told Elizabeth to make Ramos "look better" and that she could get in trouble or deported if Ramos's case got more serious. At the attorney's office, Elizabeth felt pressured not to say anything about Ramos's sexually abusing her because she did not want anything to happen to her mother. Upon leaving the attorney's office, the children's mother bought Elizabeth her first cell phone. Elizabeth was happy about receiving the phone but later realized that her mother was trying to "manipulate" and "brainwash" her.

Within a month after Denise initially reported Ramos's sexual abuse, Denise and Elizabeth were removed from their mother's care. This was initially very emotional and difficult.

After becoming more comfortable in foster care, and with the help of therapy and social workers, Denise was able to talk about the sexual abuse she suffered. Denise originally had not told anyone about the abuse because she did not think anyone would believe her. Ramos had also told Denise that if anyone found out, it would hurt her mother and break up their family. It took Elizabeth one or two years in foster care to report what Ramos had done to her. As a result of the abuse, Elizabeth was hospitalized twice for mental health concerns and contemplated suicide to avoid seeing Ramos again.

D. *Denise, Jimmy, and Elizabeth Testify About Ramos's Non-sexual Physical Abuse Towards Them*

While testifying about the home dynamics, Denise, Jimmy, and Elizabeth also testified about non-sexual physical abuse Ramos inflicted on them.

Denise testified that Ramos hit her, Jimmy, and Elizabeth with his hands, belts, hangers, cables, or any other object within his reach. If she or her siblings were farther away, Ramos would throw objects at them. This physical abuse occurred almost daily. Ramos did not physically abuse Denise's older siblings because they were adults. Doris lived in the home, but due to her busy schedule, she spent limited time there, usually leaving early in the morning and returning late at night.

The beatings sometimes left marks on Denise's arms, buttocks, and back. Although teachers at school never asked Denise about the marks, her mother was aware of the physical abuse. Sometimes Denise's mother would tell Ramos to stop, but other times she would watch and not intervene. Denise never reported the physical abuse because she thought it was a normal part of life to be hit and beaten every day.

7

Jimmy testified that once Ramos moved in with him and his siblings, he became physically abusive toward Jimmy's mother and the rest of the family. The abuse occurred about once a week and included slapping, choking, and hitting them with objects. Jimmy explained that Ramos had a terrible temper. Whenever Jimmy or his sisters heard Ramos's truck arriving home from work, they would leave the house to avoid being around him.

Jimmy described one incident where Ramos strangled him with both hands, squeezing so hard that Jimmy could not breathe for about 10 seconds. Sometimes Jimmy fought back. Ramos once slapped Jimmy, which began a fight between the two, leaving Jimmy with a shirt covered in blood. Jimmy also witnessed Ramos physically abuse his sisters Denise and Elizabeth by slapping them, pulling their hair, and pinching them. The siblings testified that Ramos was the most brutal with Jimmy, because he was a boy.

Elizabeth testified that early on Ramos and the children got along well. But after returning from his honeymoon with their mother, Ramos's behavior changed. He became demanding, was quick to anger, and would throw food or hit their mother if, for example, dinner was not ready when he came home from work. Ramos also hit their mother when she tried to prevent him from striking Elizabeth or her siblings. Elizabeth explained that Ramos would pull her hair, throw things at her, and hit her with belts, chargers, and hangers, leaving marks on her arms, legs, buttocks, and head.

Elizabeth would cry herself to sleep and had problems at school because of the abuse. She spoke to her school counselor in ninth grade "mostly every day," but she never disclosed the

8

physical abuse out of fear that her family would be separated by social workers, which Ramos had threatened would happen. Elizabeth felt too scared to speak up.

E.    *The Charges, Jury Verdicts, and Sentence*

The Los Angeles County District Attorney charged Ramos as follows:  with respect to Denise, with one count of committing a lewd or lascivious act on a minor under 14 years old (Pen. Code, § 288, subd. (a); count 1); two counts of oral copulation or sexual penetration with a child 10 years old or younger (Pen. Code, § 288.7, subd. (b); counts 2 & 8); one count of forcible rape of a child under 14 years old (Pen. Code, § 261, subd. (a)(2); count 5); one count of forcible oral copulation of a child under 14 years old (Pen. Code, § 288a, subd. (c)(2)(B); count 6);[2] one count of sexual intercourse with a child ten years or younger (Pen. Code, § 288.7, subd. (a); count 7); and one count of sexual penetration by force of a child under 14 years old (Pen. Code, § 289, subd. (a)(1)(B); count 9); and with respect to Elizabeth, with one count of committing a lewd or lascivious act on a minor under 14 years old (Pen. Code, § 288, subd. (a); count 4).[3]

As to counts 1, 4, 5, 6, and 9, the district attorney alleged Ramos committed the offenses against more than one victim each under the age of 14.  (Pen. Code, § 667.61, subd. (j)(2) & (e).)

A jury found Ramos guilty as charged and found true the multiple-victim allegation.

---

[2]    Renumbered as Penal Code section 287, subdivision (c)(2)(B).

[3]    An additional count for continuous sexual abuse of Denise in violation of Penal Code section 288.5, subdivision (a), was dismissed.  ~(1 CT 236, 285)~

The trial court sentenced Ramos to state prison for a total term of 180 years to life, consisting of consecutive terms of 25 years to life for counts 1, 4, 5, 6, 7, and 9 plus 15 years to life for counts 2 and 8.

Ramos timely appealed.

## DISCUSSION

A.   *Because the Trial Court Conducted a Section 352 Analysis in Admitting the Non-Sexual Physical Abuse Evidence, Ramos's Challenge to the Evidence on That Ground Is Preserved on Appeal*

The People argue that Ramos forfeited his section 352 challenge to the trial court's admission of the non-sexual physical abuse evidence by failing to raise it below.  Ramos claims his trial counsel was constitutionally ineffective for "failing to meaningfully object" to the admission of the physical abuse evidence under section 352.  Because Ramos's trial counsel objected generally to the non-sexual physical abuse evidence, and the trial court ruled "on a [section] 352 analysis that it [wa]s admissible," we address Ramos's evidentiary challenge on its merits and need not address Ramos's claim of ineffective assistance of counsel.

To preserve a claim that a trial court abused its discretion in admitting evidence, a party must make a timely and specific objection. (§ 353, subd. (a); *People v. Brooks* (2017) 3 Cal.5th 1, 42.)  Ordinarily, this means that to argue on appeal that evidence should have been excluded under section 352, the party needs to have made a meaningful objection on those specific grounds in the trial court.  (See *People v. Valdez* (2012) 55 Cal.4th 82, 138–139 [defendant's objection on relevance and foundation grounds

10

did not preserve for appeal the argument that certain evidence should have been excluded under section 352].)  However, because "[t]he purpose of this rule is to encourage parties to bring errors to the attention of the trial court, so that they may be corrected" (*In re S.B.* (2004) 32 Cal.4th 1287, 1293, citing *People v. Saunders* (1993) 5 Cal.4th 580, 590), an "objection will be deemed preserved if, despite inadequate phrasing, the record shows that the court understood the issue presented" (*People v. Scott* (1978) 21 Cal.3d 284, 290).

Here, the trial court understood the nature of Ramos's challenge to the non-sexual physical abuse evidence and conducted a section 352 analysis.  Ramos's attorney objected to the evidence, referring to it with the shorthand "1101 evidence."[4] The People specified that this evidence consisted of "prior complaints of physical abuse by all of the People's witnesses [who] are stepchildren of Mr. Ramos," explained the nature of the evidence, and argued for its admission.  Although Ramos's counsel did not specifically mention section 352 in making the objection, the trial court nonetheless ruled that the evidence was admissible on a "[section] 352 analysis."  (See *People v. Lewis* (2001) 25 Cal.4th 610, 637 ["evidence of uncharged misconduct "'is so prejudicial that its admission requires extremely careful analysis'" and to be admissible, such evidence "'must not contravene other policies limiting admission, such as those contained in . . . section 352'""], quoting *People v. Ewoldt* (1994) 7 Cal.4th 380, 404 (*Ewoldt*); see also § 1109 [admission of evidence of child abuse and other domestic violence is subject to a section

---

[4]     Section 1101 sets forth limitations on the admission of evidence of character or prior bad acts.

352 analysis].) We will therefore address Ramos's section 352 challenge on its merits.

B. *The Trial Court Did Not Abuse Its Discretion in Admitting the Uncharged Acts of Physical Abuse Under Section 352*

Under section 352, the trial court "in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will . . . create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." "'[T]he probative value of the evidence of defendant's uncharged offenses is the tendency of that evidence to demonstrate the existence of' the fact for which it is being admitted . . . ." (*People v. Walker* (2006) 139 Cal.App.4th 782, 806–807, quoting *Ewoldt*, *supra*, 7 Cal.4th at p. 404.)

"'The "prejudice" referred to in . . . section 352 applies to evidence which uniquely tends to evoke an emotional bias against defendant as an individual and which has very little effect on the issues. In applying section 352, "prejudicial" is not synonymous with "damaging."'" (*People v. Bolin* (1998) 18 Cal.4th 297, 320; *People v. Garceau* (1993) 6 Cal.4th 140, 178, overruled on a different ground in *People v. Yeoman* (2003) 31 Cal.4th 93, 117–118.) Relevant factors for evaluating undue prejudice in the context of uncharged acts of domestic violence include whether the acts were more inflammatory than the charged acts, the recency of the uncharged acts, and the probability that the uncharged acts evidence would confuse or distract the jury from its main inquiry. (See *People v. Jennings* (2000) 81 Cal.App.4th 1301, 1315; *People v. Poplar* (1999) 70 Cal.App.4th 1129, 1139 (*Poplar*).)

Appellate courts "apply an abuse of discretion standard when reviewing a ruling on an objection under . . . section[] 352 . .

12

. . [Citation.] A ruling subject to this standard of review 'will not be disturbed except on a showing the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice.'" (*People v. Pineda* (2022) 13 Cal.5th 186, 222, quoting *People v. Rodriguez* (1999) 20 Cal.4th 1, 9–10.)

The evidence that Ramos physically abused the children was relevant to issues at trial, and its probative value was not substantially outweighed by the risk of undue prejudice, of confusing the issues, or of misleading the jury.

For starters, "in a criminal action in which the defendant is accused of an offense involving domestic violence, evidence of the defendant's commission of other domestic violence" is relevant to show the defendant is disposed to commit domestic violence. (§ 1109; CALCRIM No. 852A; see also *People v. Johnson* (2008) 164 Cal.App.4th 731, 739 [upholding the validity of CALCRIM No. 852 with respect to section 1109 evidence].) "Domestic violence" in this context is defined broadly to include child abuse where, as here, the children reside with the defendant. (*People v. Dallas* (2008) 165 Cal.App.4th 940, 942–943.) Moreover, evidence of domestic violence in the form of acts of non-sexual physical abuse is admissible to show a defendant's propensity to commit any type of domestic violence, including sexual offenses. (See *Poplar*, *supra*, 70 Cal.App.4th at p. 1139 [evidence of prior domestic violence admissible to show propensity for rape, "a higher level of domestic violence"]; *People v. Trujillo Garcia* (2001) 89 Cal.App.4th 1321, 1332–1336 [rejecting defendant's claim that non-sexual acts of domestic violence are inadmissible because they "do not reflect a tendency toward sexually assaultive behavior"].) Accordingly, evidence of Ramos's acts of

13

non-sexual physical abuse was probative of his propensity to commit the sexual abuse charged against him.

The evidence of non-sexual physical abuse was also directly relevant to a common element in three of the charged offenses. Forcible rape, oral copulation, and sexual penetration all require the acts be "accomplished against a person's will by means of force, violence, duress, menace, or fear of immediate and unlawful bodily injury on the person or another." (Pen. Code, §§ 261, subd. (a)(2), 287, subd. (c)(2)(B), 289, subd. (a)(1)(B).) The trial court instructed the jury that for "duress" it should "consider all the circumstances, including the minor's age and her relationship to the defendant." (See CALCRIM Nos. 1000, 1015, 1045.) Evidence of Ramos's physical abuse in the home was relevant to the jury's understanding of Denise's relationship to Ramos and the threat of violence that loomed over her. Indeed, at least one court found insufficient evidence of forcible sex crimes where, among other things, "[t]here was no evidence of a threat or prior threat of bodily harm such as spanking." (See, e.g., *People v. Jeff* (1988) 204 Cal.App.3d 309, 326.)

In addition, the evidence of physical abuse illuminated aspects of the home dynamics that were relevant in at least two ways.

First, it helped explain Denise's and Elizabeth's delayed reporting of the sexual abuse. The evidence showed that Ramos was easy to anger and would frequently beat the children without provocation. The jury was permitted to infer that the children did not report their sexual abuse, at least in part, for fear of being further physically abused in response.

Second, the pervasiveness of non-sexual physical abuse in the home—which one child described as "living in Hell"—could

explain why Denise's siblings did not notice the signs of sexual abuse earlier. Denise's not wanting to be alone with Ramos, not sleeping or eating well, and appearing depressed were signs of her having suffered sexual abuse but were also consistent with being physically abused in a non-sexual way. Here, again, the jury was permitted to infer that these signs of Denise's sexual abuse were less noticeable to the siblings because Ramos's physical abuse affected all of them.

As for undue prejudice, there is always some risk that evidence of the defendant's uncharged bad acts will evoke an emotional response in the jury. But that risk did not substantially outweigh the probative value of the evidence here. This is particularly so because the uncharged acts of non-sexual physical abuse—while also serious and concerning—were no more inflammatory than the sexual abuse at issue. The jurors heard in graphic detail how dozens and dozens of times over the course of six years Ramos raped his stepdaughter, digitally penetrated her against her will, and forced her to orally copulate him starting when she was eight or nine years old. They were unlikely to be confused or distracted by the additional evidence that Ramos inflicted non-sexual physical abuse as well.

Because the trial court was within its section 352 discretion to admit the evidence of uncharged acts of non-sexual physical abuse, we affirm.

## DISPOSITION

The judgment is affirmed.


PULOS, J.*

We concur:



MARTINEZ, P. J.



SEGAL, J.

---

\* Judge of the San Diego County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.