Filed 1/28/16  P. v. Joseph CA3

NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE, | C073298 |
| Plaintiff and Respondent, | (Super. Ct. Nos. 11F07661, 11F07694) |
| v. | |
| HIRAM RAYFIELD JOSEPH, | |
| Defendant and Appellant. | |

This appeal involves two separate cases filed against defendant Hiram Rayfield Joseph in Sacramento County Superior Court.  In Case No. 11 F07661, a jury convicted defendant of violating Penal Code section 273.5, subdivision (a) (unless otherwise stated, statutory references that follow are to the Penal Code) for inflicting corporal injury resulting in a traumatic condition on a cohabitant, Tami Dailey.  In Case No. 11F07694, a jury convicted defendant of two counts of failing to register in Sacramento County as a

1

sex offender under section 290.  (§ 290.018, subd. (b).)  A single abstract of judgment was entered for both cases, and the matters were consolidated for purposes of appeal.

Defendant contends several prejudicial errors occurred in each of his trials. Regarding the domestic violence case, defendant asserts the court lacked territorial jurisdiction over his conduct in Reno.  He also claims his constitutional right to due process was violated because he did not receive adequate notice that the charges were based on such conduct.  He next contends the court abused its discretion in admitting prior uncharged acts of domestic violence under Evidence Code section 1109, a statute he argues violates his due process rights under the Fourteenth Amendment to the federal constitution.  He raises the same federal constitutional argument regarding CALCRIM No. 852, the standard jury instruction on the admissibility of domestic violence propensity evidence under Evidence Code section 1109.  Finally, he asserts his counsel was ineffective for failing to object to the "sheer volume" of the victim's prior domestic violence testimony.

In the failure to register case, defendant argues the court erred in denying his motion to exclude testimony from a police detective concerning what she told defendant about his sex offender registration obligations, or, alternatively, that the court erred in failing to instruct the jury to disregard the testimony in its entirety.  He also claims his counsel was ineffective for failing to object to evidence of prior uncharged failures to register, which he argues was inadmissible under Evidence Code section 1101.

Finding no prejudicial error in either case, we shall affirm the judgments.

FACTS AND PROCEEDINGS

A.    The Relationship between Dailey and Defendant

Dailey and defendant met in November 2004, and they immediately began a romantic relationship.  They have no children together, but Dailey had a son and defendant had a daughter from previous relationships.  Defendant promptly moved in

2

with Dailey after meeting her. Because of a felony sex offense conviction nearly a decade earlier, defendant was required to register as a sex offender.

Dailey and defendant had an on-again, off-again relationship. Defendant would live with Dailey for a period of time and then move out of the home to live with another girlfriend. Their relationship was tumultuous and often fraught with conflict. By late 2009 or early 2010, they had broken up.

Defendant eventually began calling Dailey and asking her to help obtain custody of his daughter, who was taken from her mother's care by Child Protective Services (CPS). They reunited as a couple, moved into a house in Santa Rosa with Dailey's son and began participating in services to reunite with defendant's daughter. In August 2011, Dailey and defendant moved to Sacramento with the children.

B.    The November 2011 Domestic Violence Incidents

On November 5, 2011, defendant left a message for Dailey telling her they were going to Reno for the night. Their children stayed at defendant's brother's house.

They arrived at the hotel-casino in Reno around 9:00 p.m. on November 5. Defendant went to gamble while Dailey got ready in the hotel room and then went to find him. After gambling for awhile, defendant became angry with Dailey, saying she took too long getting ready. Around 3:00 a.m. on November 6, defendant told Dailey he wanted to leave and return to Sacramento. After packing their belongings, Dailey drove defendant back to Sacramento. While driving on the freeway towards Truckee but while still in Nevada, defendant began berating Dailey and punched her in the head and stomach several times. When Dailey drove through the Food and Agricultural Inspection station outside Truckee, she did not tell law enforcement officials that defendant had beaten her.

Defendant eventually fell asleep. They arrived at their home in Sacramento around 6:00 a.m. Defendant went into their bedroom to sleep. Dailey did laundry and

3

gathered important documents, such as birth certificates and social security cards, because she had decided while driving home that it was unsafe to remain in a relationship with defendant. She did not call the police to report defendant's abusive conduct. She eventually fell asleep on the couch.

Around 10:00 a.m., defendant awoke Dailey on the couch. He asked her to come into the bedroom, which she did. She sat on the bed. After she refused his request that she perform oral sex on him, defendant back handed her in the face. The force of the blow cut Dailey's lip. She covered her head with her arms to protect herself, and defendant hit her on the back, head, and body, which caused bruising to her arms and pain to her head and back that lasted a week or two. After damaging the bedroom door, defendant then left and took Dailey's car. Dailey did not call the police to report the abuse because she was scared.

Defendant returned to the house later in the day and Dailey went to pick up the kids from defendant's brother's house. After picking up the kids, she went back home and stayed there the remainder of the night. She had a black eye and bruises on her face and body that were visible. Defendant was asleep at the house when Dailey and the children returned.

The next morning, November 7, defendant again asked Dailey for oral sex. She declined. Defendant held a knife in his hand while they spoke, and told Dailey she should "be careful of what [she said]." He then told Dailey she had to accompany him to Santa Rosa. Dailey told him the exterminator was coming so she could not go. Defendant left and Dailey eventually went to defendant's brother's house and called the police.

Officers met Dailey at defendant's brother's house. After interviewing her about the abuse, officers went to Dailey's home. Defendant was inside the home when they arrived. He was arrested and taken to jail.

4

Two days later, on November 9, a criminal written no contact order was issued prohibiting defendant from contacting Daley. Dailey also obtained a domestic violence restraining order against defendant. Despite the orders, defendant called Dailey five times from jail. Although Dailey did not answer the calls, she recorded the voice messages defendant left for her.

C.    Trial Proceedings

Case No. 11F07661  (Domestic Violence Case)

On January 23, 2013, an amended information was filed in Case No. 11F07661 charging defendant with one count of unlawfully inflicting corporal injury resulting in a traumatic condition upon Dailey on or about November 6, 2011. (§ 273.5, subd. (a).) The information alleged defendant had prior convictions for failure to register as a sex offender (§ 290, subd. (a)(1)(a)), possession of a short barreled shotgun (§ 12020), and forcible rape in concert (§ 261, subd. (a)(2)), which was a serious felony within the meaning of section 1192.7, subdivision (c), making defendant eligible for a second strike. (§§ 667, subds. (b)-(i), 1170.12.) It further alleged defendant had served a prison term for each prior offense and tshat he had not remained free of custody or had been convicted of another felony within five years of those offenses. (§ 667.5, subd. (b).) Defendant waived his right to a jury trial on the prior conviction allegations.

Before trial, the People moved in limine to allow the jury to consider the domestic violence events that took place in the car while defendant and Dailey were driving back to Sacramento from Reno on November 6 as a continuous course of conduct that culminated with the beating in Sacramento later that day. Alternatively, the People asked that the Reno assaultive conduct, as well as domestic violence incidents in May, August, and October 2011 be admitted as domestic violence propensity evidence under Evidence Code section 1109. The People requested a unanimity instruction be given and asked that

the verdict forms include special findings regarding whether the jury found the conduct in the car from Reno and later in the bedroom at the house in Sacramento to be true.

Defendant moved in limine to exclude, pursuant to Evidence Code sections 350 and 352, all evidence of any criminal offenses allegedly committed by defendant that did not result in a conviction. He specifically sought to exclude evidence of prior domestic abuse incidents against Dailey, which she failed to report at the time they occurred.

At a hearing on the motions in limine, defense counsel argued that the alleged prior instances of domestic violence by defendant against Dailey were far more inflammatory than the charged offense and therefore the evidence should be excluded as more prejudicial than probative under Evidence Code section 352. The prosecutor responded that none of the alleged domestic violence conduct was more inflammatory than the current charges. The court denied the motion to exclude the evidence, noting that all the incidents were recent and related to the same victim and that the incidents were not more inflammatory than the charges.

Dailey testified as the primary prosecution witness, describing the events on November 5 and 6 and also testifying to several prior instances of domestic violence that occurred in May, August, and October 2011. She testified to the following.

In May 2011, when she and defendant lived together in Santa Rosa, defendant came home around noon after being out all night. Dailey had stayed home from work that day because her son was ill. Defendant was mad that Dailey had not made her son attend school, and accused her of staying home just to see what time he arrived at the house. After her son left the room, defendant followed Dailey to the bedroom and continued berating her in an angry tone. She feared he would turn abusive so she yelled out. Defendant lunged at Dailey, pushing her into the closet using both hands near her neck and pinning her against the wall. Defendant punched her shoulder and choked her until she passed out.

6

Dailey had visible injuries to her neck, shoulder, arms, and legs from the attack. She was bruised and sore for about two weeks. She took pictures of the injuries a few days later, but did not report the abuse to law enforcement because she feared defendant's daughter would be taken from the home. Defendant threatened to kill her if she tried to leave or call the police.

Three months later, in August 2011, Dailey and defendant moved to Sacramento with the children. While living there, defendant back-handed Dailey after she asked who was going to watch the children while she was at work when defendant said he planned on traveling to Santa Rosa for the day. The force of the slap caused Dailey to fall backward into the bathroom vanity. Defendant told her not to ruin the "money situation" he had going with his other girlfriend in Santa Rosa. He pointed a gun at Dailey's head and told her to stop being a "bitch" and causing problems for him. Although the children were home, they did not witness the assault. Dailey again took pictures of her injuries a few days later, including bruises, but did not report the incident to police.

Defendant lived with Dailey and the children in Sacramento until September. During that time, defendant had another girlfriend in Santa Rosa whom he would visit. At the end of September, defendant moved most of his belongings to Santa Rosa and began staying with his other girlfriend more frequently.

Throughout October and November, defendant would stay sporadically with Dailey and the children in Sacramento. Although he moved most of his belongings out of the house, he still had a key to the Sacramento home. His daughter still lived in Sacramento with Dailey.

Towards the end of October, while at their home in Sacramento, defendant became enraged after his daughter supposedly left dishes in the sink. He hit Dailey several times in the head. He was also mad that Dailey had purchased a choke chain for their dog, and after pulling it off the wall, he shoved it into her neck, leaving scratch marks. He threatened to put it on her son's neck.

7

After pressing the choke chain into Dailey's neck for several minutes, defendant left and went to his daughter's room across the hall. He turned and threw the choke chain at Dailey, which hit her in the upper body. Defendant then began screaming at his daughter for not doing the dishes, and called her a "lying bitch" and other derogatory terms when she told him she had finished the dishes before she went to bed the night before. She was nine.

Defendant asked his daughter whether she wanted to see him hit Dailey in the face. The little girl responded, "no," she did not want defendant to hit her mom. Fearing defendant's daughter would be taken from the home, Dailey did not report the incident to law enforcement at the time.

Defendant did not testify. Nor did he call any witnesses.

The court instructed the jury on corporal injury to a cohabitant resulting in a traumatic condition (§ 473.5), and on the lesser included offense of simple battery. (§§ 242, 243, subd. (a).) Because the People had presented evidence of more than one abusive act to prove the corporal injury count--the abusive acts in the car while traveling from Reno and the later assaultive conduct while in the home in Sacramento--the court gave a unanimity instruction. The verdict form also included separate special findings based on each event.

The jury found defendant guilty of the greater offense, and also found true both special findings that defendant committed the crime while traveling in the car from Reno to Sacramento, and that he committed the crime while in the home he and Dailey shared in Sacramento.

The parties stipulated that the court could determine whether the prior conviction allegations were true based on the transcript and record in Case No. 11F07694, which was tried first.

The court found true the prior conviction allegations in a subsequent bifurcated proceeding.

8

The court denied defendant's motion to strike his prior strike conviction under *People v. Superior Court* (*Romero*) (1996) 13 Cal.4th 497 (*Romero*), and sentenced defendant to the upper term of four years, doubled to eight, for the domestic violence count, plus three consecutive one-year terms on the prison prior enhancements. The sentence was combined with the sentence imposed in Case No. 11F07694, which is discussed below. The total prison term for both cases was 12 years, four months. Defendant timely appealed.

Case No. 11F07694  (Failure to Register Case)

Defendant was charged in Case No. 11F07694 for violating sex offender registration requirements under section 290. An amended information filed January 8, 2012, charged defendant with two counts of violating section 290.018, subdivision (b), for failing to properly register as a sex offender with law enforcement when defendant and Dailey moved to Sacramento County in August 2011 and for failing to register that he had more than one residence at the time. As in the domestic violence case, the information alleged defendant had three prior convictions, one of which was a strike, and that defendant had served three prior prison terms. Defendant waived his right to a jury trial on the prior conviction and prior prison term allegations and the issues were bifurcated from the substantive offense. The following evidence was presented at trial on the registration offenses.

Dailey testified to her on-again, off-again relationship with defendant, and how he would live with her for awhile and then move out to be with other women. By July 2010, they were back together and living at a house on Brigham Avenue in Santa Rosa with Dailey's son. At the time, they were trying to obtain custody of defendant's daughter, who was placed with CPS.

Defendant and Dailey met with Erica Dresslove, a CPS representative, several times at the Brigham Avenue house to discuss defendant's daughter coming to live with

9

them, and the court eventually approved a 90-day temporary stay. Because they needed a larger home to accommodate defendant's daughter, the couple and the children moved to 57 Kennelford Circle in Sacramento in August 2011. They moved furniture, personal belongings, two dogs, and Dailey bought defendant a pool table for the house.

Defendant made copies of the house key for himself, Dailey and each of the kids. He helped obtain utilities and services for the home, and received mail at the address.

Defendant lived with Dailey and the children at the Sacramento home from mid-August, when they moved, until the end of August. He and Dailey shared a bedroom and he slept at the house. Defendant stayed the night in the Sacramento house approximately half of September. He told Dailey that on the other days he was staying with his girlfriend in Santa Rosa. Both he and Dailey contributed to maintaining the Sacramento home, however.

On September 16, Dresslove, the CPS representative, visited the Kennelford home in Sacramento to check on defendant's daughter and see how the 90-day home stay was going. Defendant was present for the visit, and showed Dresslove around "his home."

Ten days later, on September 26, defendant sent a text message to Dailey stating he had moved his personal belongings to his other girlfriend's house in Santa Rosa. When Dailey returned home that night, most of defendant's things were gone, although a few personal items remained. Defendant's daughter remained with Dailey in Sacramento.

Defendant returned to the Sacramento home and spent the night approximately six or seven times in October. Defendant and Dailey continued to have an intimate relationship during that time.

On October 20, Lisa Issel, the Sacramento County family facilitator for his daughter, visited the Sacramento home. Defendant was present for the in-home visit. He did not tell Issel he did not reside at the house.

10

The next day, October 21, Dressel conducted a second in-home visit in Sacramento. Although defendant was not present, the house appeared in the same condition as on her prior visit. She was never told defendant was not living at the house.

On November 5, defendant returned to Sacramento and he and Dailey went on the previously described trip to Reno. They returned to Sacramento early on November 6, Dailey reported defendant's domestic violence conduct to police on November 7, and he was arrested at the Sacramento home later that day. When Dailey returned to the house that night, she saw numerous duffel bags full of defendant's belongings in their shared bedroom. Following defendant's arrest, Dailey found defendant's wallet, which contained a temporary sex offender registration card and paperwork containing defendant's acknowledgement of the registration rules.

Detective Patton, a City of Sacramento police officer testified for the People. Detective Patton investigated whether defendant resided in Sacramento at any time from August 13 to November 7, and whether he had ever registered as a sex offender in the County. He interviewed Dailey at the Kennelford address to ascertain whether defendant resided at the home. After consulting several law enforcement databases, Detective Patton did not find any information showing defendant had registered in Sacramento during that time.

Detective Harrington, an officer with the City of Santa Rosa who was assigned to the domestic violence and sexual assault unit, also testified for the People. Her job duties included confirming the city's sex offender registrants were complying with their registration obligations. She described the standard 8102 form sex offenders are required to sign when registering in a jurisdiction. An offender must individually initial next to separately listed requirements, which delineate what he or she must do while living in California.

Detective Harrington met with defendant on September 28, 2011, in Santa Rosa to update his sex offender registration. Two weeks earlier, defendant had met with a

11

different detective and told him he was moving to either Stockton or Sacramento. Defendant told Detective Harrington that he had not registered in either Stockton or Sacramento, had no addresses to report in either of those jurisdictions, and that he wanted to register as transient in Santa Rosa.

Detective Harrington testified that she explained defendant's registration obligations under the sex offender registration law to him. She told defendant that she would register him transient but that he had to provide her with any addresses where he was staying for a night or two, which she described as "couch-hopping." The court admonished the jury that the testimony was admitted for the limited purpose of showing defendant's knowledge of his registration obligations regardless of whether Detective Harrington's explanation of the law was legally correct or incorrect.

After further discussions, defendant registered his girlfriend's address on Liscum Street in Santa Rosa. When Detective Harrington asked defendant whether there was an address in Sacramento where he stayed since he worked for a company based there, defendant responded no. Defendant never mentioned the 57 Kennelford house in Sacramento, which he shared with Dailey and the children.

Defendant did not testify. He did present several witnesses who testified to seeing defendant in Santa Rosa on various days in August or September 2011.

Defense counsel requested that the court instruct the jury that it could not consider "at all" Detective Harrington's statements about the various circumstances that she told defendant the law required him to register an address or residence. The court refused, finding the proposed instruction was argumentative and not sufficiently neutral. The court did, however, instruct the jury that, "The testimony of Brenda Harrington about her explanation to defendant Joseph regarding the meaning of the sex offender registration law and his obligations under that law, whether correct or incorrect, were admitted for the limited purpose of determining whether defendant Joseph had knowledge of his obligations under the sex offender law."

12

The jury convicted defendant of all charges, and the court found the prior conviction and prior prison allegations true. The court sentenced defendant to a consecutive one year, four months on count 1 and stayed the same sentence on count 2. Defendant timely appealed.

DISCUSSION

I

*Territorial Jurisdiction*

Defendant first contends that in the domestic violence case the court lacked territorial jurisdiction over his assaultive conduct in Reno, and that his due process rights were violated because he had no notice that such conduct was included in the charge against him. We conclude defendant has failed to establish prejudice even if we assume, without deciding, that the alleged error occurred.

"It long has been established that a state will entertain a criminal proceeding only to enforce its own criminal laws, and will not assume authority to enforce the penal laws of other states or the federal government through criminal prosecutions in its state courts." (*People v. Betts* (2005) 34 Cal.4th 1039, 1046 (*Betts*).) This principle is commonly referred to as territorial jurisdiction. (*Ibid.*) Criminal activity, however, frequently is not confined to the borders of a single state, and strictly applying territorial principles can make prosecuting crimes involving more than one state problematic. (*Id.* at p. 1046.) "California has addressed the problem of criminal activity that spans more than one state by adopting statutes that provide our state with broader jurisdiction over interstate crimes than existed at common law[,]" which applied a narrow principle of territorial jurisdiction. (*Id.* at p. 1047.)

Section 27 generally permits a defendant to be punished under California law for any crime committed "in whole or in part" in the state. (§ 27, subd. (a)(1).) Section 778 also establishes territorial jurisdiction for specific types of interstate situations. That

13

statute provides, "[w]hen the commission of a public offense, commenced without the State, is consummated within its boundaries by a defendant, himself outside the State, through the intervention of an innocent or guilty agent or any other means proceeding directly from said defendant, he is liable to punishment therefor in this State in any competent court within the jurisdictional territory of which the offense is consummated." (§ 778.)

In this case, we need not decide whether the court had territorial jurisdiction over defendant's acts while traveling from Reno under a continuous course of conduct theory. Even assuming the court lacked territorial jurisdiction over defendant's acts in the car, we find defendant has failed to establish prejudice as the jury unanimously found defendant guilty beyond a reasonable doubt of inflicting a corporal injury to Dailey, which resulted in a traumatic condition, based on acts committed *solely* in Sacramento County. Because defendant concedes he received sufficient notice that the criminal charge was based on his conduct in Sacramento County, we similarly reject his due process argument.

Defendant was charged with a single count of violating section 273.5. (§ 273.5, subd. (a).) The verdict form included two separate special findings, which were based on defendant's conduct in Reno and defendant's conduct in Sacramento, respectively. The jury was instructed that it could find defendant guilty of the charged offense if it found that defendant either committed the crime while traveling in the car from Reno or if he committed the crime while in the home at 57 Kennelford Circle in Sacramento, or both. The court told the jury that it could not find defendant guilty unless all jurors agreed that the defendant committed acts at one or both of the places and that all jurors agreed on the place or places he committed the acts. The court further instructed the jury that the special findings had to be unanimous and had to be supported by proof beyond a reasonable doubt.

In rendering its guilty verdict, the jury found true the special finding that defendant had inflicted a corporal injury on Dailey that resulted in a traumatic condition

14

while in the home they shared on Kennelford Circle in Sacramento. The jury, then, found beyond a reasonable doubt that defendant violated section 273.5 in Sacramento, where the court indisputably had territorial jurisdiction, regardless of its separate finding regarding the Reno conduct. (§ 27.)

Given the court's explicit instructions on the necessary burden of proof for special findings--beyond a reasonable doubt--defendant's argument that the jury convicted him of the offense even though it likely did not find either special finding true beyond a reasonable doubt is without merit. "Jurors are presumed able to understand and correlate instructions and are further presumed to have followed the court's instructions." (*People v. Sanchez* (2001) 26 Cal.4th 834, 852.)

The jury, moreover, undoubtedly would have heard and considered the Reno evidence even if that conduct was not included in the charge against defendant. As defense counsel recognized at the hearing on the motions in limine, and we agree, such evidence was admissible under Evidence Code section 1109 as domestic violence propensity evidence. (Evid. Code, § 1109, subd. (a)(1).)

Because any alleged error concerning the court's jurisdiction over the Reno conduct was harmless on this record, we reject defendant's territorial jurisdictional challenge.

II

*Domestic Violence Propensity Evidence*

Defendant contends the court abused its discretion in admitting evidence of prior domestic violence instances between defendant and Dailey under Evidence Code section 1109. He further argues that Evidence Code section 1109 and CALCRIM No. 852, which is the pattern jury instruction regarding domestic violence propensity evidence, are unconstitutional. Finding neither an abuse of discretion in admitting the propensity

15

evidence here nor an unconstitutional infirmity in the statute or jury instruction, we reject defendant's contentions.

Evidence of prior criminal acts is ordinarily inadmissible to show a defendant's disposition to commit such acts. (Evid. Code, § 1101.) The Legislature, however, has created an exception to this rule in criminal domestic violence cases. (Evid. Code, § 1109; *People v. Brown* (2011) 192 Cal.App.4th 1222, 1232 (*Brown*).) In those cases, the Legislature has concluded that the policy considerations favoring admitting evidence of uncharged domestic violence offenses outweigh the policy considerations favoring excluding such evidence. (*Brown* at p. 1232.) "Section 1109, in effect 'permits the admission of defendant's other acts of domestic violence for the purpose of showing a propensity to commit such crimes. [Citation.]' " (*Ibid.*) The admission of prior acts as propensity evidence encompasses both charged and uncharged acts. (*People v. Falsetta* (1999) 21 Cal.4th 903, 917-918 (*Falsetta*).)

Even if the evidence is admissible under section 1109, however, "the trial court must still determine, pursuant to section 352, whether the probative value of the evidence is substantially outweighed by the probability the evidence will consume an undue amount of time or create a substantial danger of undue prejudice, confusion of issues, or misleading the jury." (*Brown, supra,* 192 Cal.App.4th at p. 1233.) "The court enjoys broad discretion in making this determination, and the court's exercise of discretion will not be disturbed on appeal except upon a showing that it was exercised in an arbitrary, capricious or patently absurd manner that resulted in a manifest miscarriage of justice." (*Ibid.*) With these concepts in mind, we turn to the prior acts evidence admitted in this case.

Defense counsel moved, pursuant to Evidence Code section 352, to exclude all evidence of any criminal offenses allegedly committed by defendant that did not result in a conviction. Counsel specifically requested that the court exclude any testimony from Dailey regarding prior domestic violence assaults that were not reported.

16

The court denied the request and permitted Dailey to testify to prior instances of domestic violence in May, August, and October 2011, concluding the evidence was probative not only on propensity but also on why Dailey delayed reporting the charged abuse. The court further found the prior acts were recent and involved the same victim thus making them more probative than prejudicial. On this record, we cannot say the court failed to properly exercise its discretion under Evidence Code section 352.

" 'The principal factor affecting the probative value of an uncharged act is its similarity to the charged offense.' " (*People v. Hollie* (2010) 180 Cal.App.4th 1262, 1274 (*Hollie*) [discussing Evidence Code section 1108 concerning the admission of uncharged sexual offenses, which is similar to Evidence Code section 1109]; *People v. Johnson* (2008) 164 Cal.App.4th 731, 739 [noting Evidence Code sections 1108 and 1109 are virtually identical].) Another factor affecting probative value is the amount of time between the uncharged acts and the charged offense. (*Ibid.*) The more recent the uncharged act or prior instance of domestic violence, the more probative the evidence. (*Hollie* at p. 1276; *People v. Harris* (1998) 60 Cal.App.4th 727, 739 (*Harris*) [" 'Remoteness' or 'staleness' of prior conduct is an appropriate factor to consider in a section 352 analysis"].) "The factors affecting the prejudicial effect of uncharged acts include whether the uncharged acts resulted in criminal convictions and whether the evidence of uncharged acts is stronger or more inflammatory than the evidence of the charged offenses." (*Hollie* at p. 1274.)

After considering both the probative value of the evidence and its prejudicial effect, we find that the trial court did not abuse its discretion by admitting the uncharged domestic violence acts evidence under section 1109.

Dailey testified that in May 2011 defendant became angry after she stayed home with her sick son. He punched and choked Dailey. Although her son was in the next room, he did not witness the attack. In August 2011, defendant got mad at Dailey and struck her in the face after she asked who was going to watch the kids if defendant went

17

to Santa Rosa to visit his other girlfriend. He pointed a gun at her during the attack. The children did not witness the assault. In October 2011, defendant became angered over dirty dishes, which he thought his daughter had left in the sink. He hit Dailey several times in the head. The children were not at home. He also was mad that Dailey had purchased a choke chain for his dog. After the children got home from school, defendant and Dailey went into their bedroom and continued to argue. While there, defendant pressed the chain into Dailey's neck, leaving scratch marks. The children were not in the bedroom at the time.

These prior acts of domestic violence were similar in nature to the pending charges, where defendant was accused of hitting Dailey in the head after he got mad at her while driving home from Reno and also smacking and hitting her in Sacramento after she refused to perform oral sex on him. Defendant himself concedes that the uncharged prior acts were "nearly identical acts of violence" as the instant charge.

The prior acts, therefore, were highly probative of the pattern of conduct defendant engaged in with Dailey throughout their tumultuous relationship. In each instance, defendant would become angry with Dailey and then hit her or threaten her with a weapon--a gun, a choke chain, or a knife. All of the prior domestic violence acts, moreover, occurred within a few months of each other and of the charged offense. Thus, none were remote in time. And all involved the same victim--Dailey.

Dailey's credibility, moreover, was a key issue in the case. Defendant argued in closing that Dailey was lying. Dailey's testimony regarding the prior domestic violence acts and the photographic evidence of Dailey with bruises around the times of the alleged acts tended to corroborate Dailey's testimony. This corroboration tended to make her testimony regarding the charged offense more believable, and to undermine defendant's defense that she fabricated the abusive incidents.

Defendant's attempt to characterize the prior acts as too inflammatory is unavailing. He argues that because Dailey testified that one or both of the children were

18

present in the home when they occurred or that defendant had a gun during one incident, the prior acts evidence essentially poisoned the jury against him. We are not persuaded.

*Harris*, *supra*, 60 Cal.App.4th at p. 738, provides useful guidance on when prior acts evidence is too inflammatory to be admissible. There, the defendant, a caregiver in a mental hospital, was charged with sexually assaulting two patients by licking and fondling them. (*Ibid.*) Both women were on speaking terms with the defendant after the assaults. (*Ibid.*) The court admitted evidence that the defendant had been convicted of burglary with infliction of great bodily injury 23 years earlier. (*Id.* at pp. 738-739.) In describing the incident, the jury heard testimony of a viciously beaten and bloody victim who was a stranger to the defendant. (*Ibid.*)

This court found that the prior acts evidence was inflammatory in the extreme. (*Harris, supra,* 60 Cal.App.4th at p. 738.) The charged crimes, involving a breach of trust and the taking advantage of two emotionally and physically vulnerable women were of a significantly different nature and quality than the violent and perverse attack on a stranger that was described to the jury. (*Ibid.*)

Here, Dailey testified that the children did not witness the abuse even though they were home during some of the prior acts. For example, Dailey testified that her son went into his own bedroom and turned on the television and defendant shut the door to his and Dailey's bedroom before he assaulted her in May 2011. This greatly lessened the likelihood that Dailey's son heard them arguing, making the testimony much less inflammatory. And the testimony that defendant held a gun during one incident was rendered less inflammatory because Dailey testified defendant did not use the gun to shoot or otherwise injure her.

We also find defendant's contention that the jury likely convicted him in this case to punish him for the prior uncharged acts unpersuasive. We are confident the trial court effectively instructed the jury to consider the uncharged acts evidence only for proper

19

limited purposes. "[W]e must presume the jury adhered to the admonitions." (*Hollie, supra,* 180 Cal.App.4th at p. 1277.)

The evidence of defendant's inclination to assault Dailey after getting mad or annoyed with her was no doubt damaging to his defense that the events in the car from Reno and those in Sacramento when they returned home did not happen. But, in applying Evidence Code section 352, " 'prejudicial' is not synonymous with 'damaging.' " (*Hollie, supra,* 180 Cal.App.4th at p. 1276.) Undue prejudice does not refer to evidence that tends to prove guilt; it refers to evidence that prompts an emotional reaction against defendant that tends to cause a jury to decide the case on an improper basis. (*Ibid.*) On this record, defendant was not unduly prejudiced by the prior acts evidence.

To exhaust his state remedies and to preserve his right to challenge Evidence Code section 1109 and CALCRIM No. 852, the pattern jury instruction on domestic violence propensity evidence, on constitutional due process grounds in federal court, defendant raises the arguments here. He acknowledges, however, that we are bound under *AutoEquity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455-456, to follow state law precedent finding both the statute and the jury instruction constitutional.

In *Falsetta*, *supra*, 21 Cal.4th at p. 917 (*Falsetta*), the California Supreme Court upheld Evidence Code section 1108, which is nearly identical to Evidence Code section 1109, against a similar constitutional challenge, finding the statute did not violate due process because it incorporated a careful weighing process under Evidence Code section 352 before such propensity evidence could be admitted. By parity of reasoning, several appellate courts, including this court, have found Evidence Code section 1109 constitutional. (See e.g., *People v. Johnson* (2000) 77 Cal.App.4th 410, 417; *People v. Brown* (2000) 77 Cal.App.4th 1324, 1328-1329; *People v. Johnson* (2010) 185 Cal.App.4th 520, 529.)

20

In *People v. Reliford* (2003) 29 Cal.4th 1007, 1016, the California Supreme Court ruled CALJIC No. 2.50.01, an instruction explaining the application of Evidence Code section 1108, was constitutionally valid because it was not "reasonably likely a jury could interpret the instructions to authorize conviction of the charged offenses based on a lower standard of proof." Appellate courts have relied on the analysis in *Reliford* to uphold the constitutionality of the corresponding CALJIC instruction, CALJIC No. 2.50.02, which explains the use of domestic violence propensity evidence under Evidence Code section 1109. (See e.g., *People v. Pescador* (2004) 119 Cal.App.4th 252, 261-262.) This court, in turn, has found that "there is no material difference between the language found constitutional in CALJIC No. 2.50.02 and that in CALCRIM No. 852." (*People v. Reyes* (2008) 160 Cal.App.4th 246, 251.) In so finding, we have rejected the argument that CALCRIM No. 852 violates an accused's due process rights. We do so again here.

While the People argue lower federal courts have already rejected constitutional due process challenges to Evidence Code section 1109 and CALCRIM No. 852, we express no opinion on the likelihood of success of defendant's arguments in federal court.

III

*Ineffective Assistance of Counsel*

Defendant raises ineffective assistance of counsel claims in both the domestic violence case and the failure to register case. He first argues his counsel was ineffective for failing to object to the "sheer volume" of Dailey's prior domestic violence testimony in Case No. 11F07661. He next argues that his counsel was ineffective for failing to object to evidence of prior uncharged failures to register under section 290 that was introduced in Case No. 11F07694. Defendant was not denied the effective assistance of counsel in either case.

21

General Principles

To establish ineffective assistance of counsel, defendant must show that his counsel's representation fell below the standard of a competent advocate and that he suffered prejudice from the deficient performance. (*People v. Ledesma* (1987) 43 Cal.3d 171, 216-218 (*Ledesma*).) Prejudice is established if a reasonable probability exists that, but for counsel's errors, the result would have been different. (*Ibid.*) A "reasonable probability" is a probability sufficient to undermine confidence in the outcome. (*People v. Bolin* (1998) 18 Cal.4th 297, 333.) "If it is easier to dispose of an ineffectiveness claim on the ground of lack of prejudice . . . that course should be followed." (*Strickland v. Washington* (1984) 466 U.S. 668, 697 [80 L.Ed.2d 674].)

In determining whether counsel's performance was deficient, we exercise deferential scrutiny and "assess the reasonableness of counsel's acts or omissions . . . under the circumstances as they stood at the time that counsel acted or failed to act." (*Ledesma, supra,* 43 Cal.3d at p. 216.) Courts should not second-guess reasonable, if difficult, tactical decisions in the harsh light of hindsight. (*People v. Scott* (1997) 15 Cal.4th 1188, 1211-1212 (*Scott*).)

Domestic Violence Case

Prior to trial, defense counsel vigorously moved to exclude all evidence of any criminal offenses allegedly committed by defendant that did not result in a conviction, and, more specifically, all evidence of prior domestic abuse acts against Dailey. The court denied counsel's motion and granted the People's motion to admit the evidence.

Defense counsel's motion sufficiently raised an objection to the "volume" of evidence concerning uncharged prior acts of domestic violence against Dailey. Given that the defense had already attempted, unsuccessfully, to prevent the introduction of Dailey's testimony on the uncharged prior acts, it would have been futile for counsel to once again lodge an objection while she testified. Defense counsel was thus not

22

ineffective as defendant argues. (*People v. Padilla* (1995) 11 Cal.4th 891, 927 [counsel not ineffective for failing to object during testimony where court had previously overruled his pre-testimony objection], overruled on other grounds by *People v. Hill* (1998) 17 Cal.4th 800.)

Defendant cites to several instances where he believes his trial counsel should have objected but did not show proof that counsel was ineffective. The absence of objections immediately after the allegedly prejudicial testimony, however, does not mean his counsel was ineffective. As soon as the jury was dismissed for a recess, counsel did object and explained to the court that he did not do so while Dailey was testifying because he did not want to highlight the testimony for the jury. "The choice of when to object is inherently a matter of trial tactics not ordinarily reviewable on appeal." (*People v. Frierson* (1991) 53 Cal.3d 730, 749 [counsel could reasonably choose not to object but to counter with argument of his own]; *People v. Barnett* (1998) 17 Cal.4th 1044, 1140-1141 [counsel reasonably might have chosen for tactical reasons not to draw jury's attention to issue].) We will not second guess defense counsel's trial tactics here. (*Scott, supra,* 15 Cal.4th at pp.1211-1212 [courts should not second-guess trial counsel's reasonable, if difficult, tactical decisions].)

Defense counsel, moreover, did object during portions of Dailey's testimony and asked that several of her responses be stricken. When Dailey described the circumstances surrounding the May 2011 domestic violence incident, and, more specifically, when she told the jury her son knew to leave the room when defendant was mad and that he did not witness defendant hit Dailey, defendant's counsel objected and moved to strike the testimony, claiming it was based on Dailey's speculation. The court refused to strike the testimony, but did admonish the jury that Dailey's testimony was simply "her interpretation" of the events.

Defense counsel later moved to strike Dailey's testimony that after defendant assaulted her during the May incident he left the bedroom to ensure her son had not

called the police. The court again admonished the jury that the testimony merely represented Dailey's interpretation of events and that she could not testify to what defendant was thinking at the time.

Counsel successfully moved to strike Dailey's testimony that the children commented on her bruised face after the charged offense. Defense counsel objected again when Dailey testified about defendant yelling vulgarities at his daughter during the October 2011 incident. The court admonished the prosecutor to move to another topic, which she did.

On this record, defendant received the effective assistance of counsel. Although in hindsight he may disagree with his trial counsel's tactical choices made during the heat of trial, such disagreement is insufficient to establish a legally deficient performance under professional norms.

<u>Failure</u> <u>to</u> <u>Register</u> <u>Case</u>

During trial, the court admitted evidence and testimony establishing defendant lived with Dailey for approximately a year at an address in Santa Rosa that he did not register, although he registered at three other addresses and also as transient during that time. According to defendant, this evidence was inadmissible under Evidence Code section 1101. Defendant specifically cites as inadmissible the People's exhibits 25 through 31, which were sex offender registration forms defendant executed between July 2010 and July 2011, and Detective Harrington's testimony explaining the exhibits. Defendant argues his counsel was ineffective for failing to object to the evidence of the uncharged failures to register.

Like in the domestic violence case, defendant's counsel moved in limine, under Evidence Code sections 350 and 352, to exclude all evidence "regarding any criminal offenses allegedly committed by [defendant] that did not result in conviction." Such an objection necessarily included an objection to evidence showing defendant had failed to

24

register addresses from July 2010 to July 2011. Contrary to defendant's contention, then, defense counsel did move to exclude evidence of prior uncharged failures to register.

While it does not appear from the record that defense counsel pressed for a ruling on his motion during the hearing, the record makes clear the court implicitly denied the motion by admitting the evidence of which defendant complains. Even if defense counsel had pressed for a ruling, however, the court would have been amply justified in denying counsel's request to exclude the evidence.

Evidence Code section 1101, which defendant claims barred the evidence, provides in relevant part that "evidence of a person's character or a trait of his or her character (whether in the form of an opinion, evidence of reputation, or evidence of specific instances of his or her conduct) is inadmissible when offered to prove his or her conduct on a specified occasion." (Evid. Code, § 1101, subd. (a).) Nothing in Evidence Code section 1101, however, "prohibits the admission of evidence that a person committed a crime, civil wrong, or other act when relevant to prove some fact (such as motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident . . . ) other than his or her disposition to commit such an act." (Evid. Code, § 1101, subd. (b).)

Here, the evidence regarding the prior registration forms defendant signed between July 2010 and July 2011, when defendant lived with Dailey at an unregistered address in Santa Rosa, were relevant to prove defendant knew of his duty to register, a necessary element for a section 290 conviction. (*People v. Barker* (2004) 34 Cal.4th 345, 359 (*Barker*) [willful failure to register requites *actual knowledge* of the duty to register for purposes of section 290 violation].) In *Barker*, the Supreme Court cited with approval prior registration forms the defendant had signed as evidence that the defendant knew of his obligation to register. (*Id.* at pp. 359-360.) Other courts have done the same. (See e.g., *People v. Poslof* (2005) 126 Cal.App.4th 92, 107 [multiple registration documents

25

defendant signed stating that he understood his lifetime registration requirements could be used by jury to infer defendant did have actual knowledge of registration duty].)

For the same reasons, Detective Harrington's testimony explaining the prior registration forms was relevant to defendant's knowledge of his duty to register. Thus, the court would have been justified in denying an objection to the admissibility of the evidence.

The evidence was also relevant to show, as the People argue, defendant's motive in failing to register his address in Sacramento. At the time, he was dating another woman in Santa Rosa who was unaware of his relationship with Dailey. The jury could have reasonably inferred from the evidence that defendant did not register the Sacramento address, nor any of the previous addresses defendant lived at with Dailey, in order to keep his relationship a secret from his other girlfriend.

Defense counsel, moreover, tried the case to the jury on the theory that while defendant sometimes visited Dailey and the children in Sacramento, he never resided there for purposes of the sex offender registration laws. In closing argument, he relied on the evidence defendant now claims should have been excluded. Counsel argued that defendant's prior registration paperwork showed he took his registration responsibilities seriously and that he complied with the registration rules. This was a reasonable tactical choice.

IV

*Evidence of Detective Harrington's Conversation with Defendant Regarding His Section 290 Registration Requirements*

Under section 290.010, "[i]f the person who is registering [as a sex offender] has more than one residence address at which he or she regularly resides, he or she shall register in accordance with the ACT in each of the jurisdictions in which he or she regularly resides, regardless of the number of days or nights spent there." (§ 290.010.)

26

Defendant contends the trial court erroneously permitted Detective Harrington to testify about what she told him concerning his obligations to register under section 290 because the statements were inadmissible legal conclusions. Although we found no evidence showing that the People designated Detective Harrington as an expert witness, or that the court ever recognized her as such, defendant nevertheless argues her testimony constituted improper expert opinion evidence. For purposes of resolving defendant's challenge, we will assume Detective Harrington qualified as an expert in this case. (*People v. Prince* (2007) 40 Cal.4th 1179, 1223-1224 (*Prince*) [recognizing that experienced law enforcement officials often testify as experts in a variety of circumstances].)

According to defendant, Detective Harrington should have been precluded from testifying that she told him the law required him to register any addresses where he might be staying the night, or what she described as "couch-hopping." Detective Harrington incorrectly explained the law during their conversation, he contends, because section 290.010 only mandates that he register addresses at which he "regularly resides," and not "every couch, hotel, or 'girlfriend' " he stays with. He asserts the detective's testimony preempted the jury's determination of what constituted "regularly resides" within the meaning of section 290.010 by wrongly defining it for them.

We need not decide whether the court abused its discretion in admitting the testimony, however. (*Prince, supra,* 40 Cal.4th at p. 1222 ["We apply an abuse of discretion standard in reviewing a trial court's decision to admit the testimony of an expert"].) We conclude that such an error, if it occurred, was harmless. That is, after reviewing the record we find it is not reasonably probable that the jury would have reached a result more favorable to defendant had the court excluded the allegedly improper opinion testimony. (*People v. Robbie* (2001) 92 Cal.App.4th 1075 [applying the harmless error standard in *People v. Watson* (1956) 46 Cal.2d 818, 836].)

27

The evidence was overwhelming and largely uncontradicted that during at least August and September defendant regularly resided with Dailey and the children at 57 Kennelford in Sacramento. Dailey testified that she and defendant and their children moved to Sacramento in the middle of August 2011. For at least the next two weeks, defendant consistently stayed the night with her and the children at the home. Defendant moved his personal belongings into the home during that period. He set up utilities and services at the house, and he received mail there. He had personal house keys made for each family member. Dailey testified that defendant stayed at least half of September in the Sacramento house as well. On the nights he was not there, defendant told Dailey he was staying with his other girlfriend in Santa Rosa.

Dailey's testimony was corroborated by Dresslove, the Santa Rosa CPS caseworker for defendant's daughter. She testified that based on the August 18, 2011, court hearing where the court approved the 90-day temporary stay, she understood defendant would be residing with his daughter, Dailey and her son at 57 Kennelford in Sacramento. Defendant had supplied the address to Dresslove and her agency. Because defendant's daughter was moving out of the jurisdiction, Dresslove referred her to Issel, a family facilitator in Sacramento whose agency provided services to children who were leaving group homes and trying to reunify with their families.

Dresslove and Issel each separately visited the Sacramento home to check on his daughter's welfare. During these home visits, in September and October 2011, defendant gave each woman a tour of "his home."

After hearing this evidence, the court instructed the jury as follows: "You must follow the law as I explain it to you, even if you disagree with it. [¶] If you believe that the attorneys' comments on the law conflict with my instructions, you must follow my instructions." The jury was told that "[s]ome words or phrases used during this trial have legal meanings that are different from their meanings in everyday use. These words and

28

phrases will be specifically defined in these instructions. [¶] Please be sure to listen carefully and follow the definitions that [the court] give[s] you."

To find defendant guilty of count one, the court instructed the jury that, among other things, the People had to prove beyond a reasonable doubt that "defendant resided in Sacramento, California, on or about and between August 13th, 2011, and November 7th, 2011," that he actually knew he had a "duty" to register the Sacramento address, and that he "willfully failed to register as a sex offender with the police department in Sacramento within five working days of establishing that address as a residence in Sacramento." The term "residence" was defined as "one or more addresses where someone regularly resides, regardless of the number of days or nights spent there, such as a shelter or structure that can be located by a street address." The jury was also told that a "residence" "may include, but is not limited to, houses, apartment buildings, motels, hotels, homeless shelters, and recreational and other vehicles."

To find defendant guilty of count two, the court instructed the jury it had to find beyond a reasonable doubt that "defendant resided at multiple residence addresses, including one address within Sacramento, on or about and between August 13th, 2011 and November 7th, 2011," that he actually knew he had a duty to register the Sacramento address and that he had to register within five working days all residence addresses where he regularly resided, and that defendant willfully failed to register multiple residences.

The court also instructed the jury that defendant's obligations under the registration law were set forth in exhibit numbers 23 through 37. These were the 8102 registration forms that delineated the registration requirements.

During deliberations, the jury submitted a question to the court asking whether "living" and "residing" had the same definition. The court responded that the operative words for purposes of the sex offender registration law were "residing" and "residence," and that "living" should be interpreted as having the same meaning as "resided." The

29

court also gave the definition of "residence" again. We presume the jury followed the court's instructions. (*Hollie, supra,* 180 Cal.App.4th at p. 1277.)

The jury's question during deliberations shows that, unlike defendant claims, jurors did not rely on Detective Harrington's testimony for the definition of "regularly resides." Instead, the jury asked for clarification regarding the meaning of "residing" from the court. The court properly instructed the jury and referred it back to the definition of "residence." Given the court's instructions, and in light of the overwhelming evidence against defendant, the result would have been the same even if Detective Harrington had been precluded from testifying about what she told defendant his registration obligations were under section 290. Thus, any alleged error in permitting Detective Harrington to testify as she did was harmless on this record.

DISPOSITION

The judgment in Case No. 11F07661 and the judgment in Case No. 11F07694 are affirmed.

                                    HULL                    , J.


We concur:


      NICHOLSON       , Acting P. J.


      HOCH          , J.


30